MILES M. O'BRIEN et al., as Receivers, etc., Appellants, *v.* HUGH J. GRANT, as Receiver, etc., Respondent.

The M. S. Bank and the St. N. Bank entered into an agreement, by which the latter, which was a member of the New York Clearing House Association, a voluntary association of banks and bankers, agreed to act as agent of the former in clearing its checks through the clearing house; the M. S. Bank to keep at all times a balance of $50,000 in money and $100,000 of good bills receivable with the former. By the

constitution of said association it is provided that whenever exchanges are made at the clearing house pursuant to arrangement between members, through one of them, and banks not members, the receiving bank at the clearing house shall in no case discontinue the arrangement without giving previous notice; the notice not to take effect until the exchanges of the morning following the receipt thereof shall have been completed. The M. S. Bank was aware of this resolution at the time of making the arrangement, and it sent a letter to the clearing house committee, inclosing copy of a resolution signifying its acquiescence in the terms of the circular issued by that committee. On August 8, 1893, the St. N. Bank, desiring to terminate the arrangement because of failure of the M. S. Bank to keep up the prescribed cash balance, gave the notice required by said constitution, which was served upon the banks constituting the association. At this time the M. S. Bank was insolvent. The St. N. Bank was ignorant of that fact, but knew of it before exchanges were made on the next day. It held at the time certain collateral securities taken upon loans made upon notes of the M. S. Bank, and by agreement they or their proceeds might be applied to any other obligations of that bank. On August ninth the St. N. Bank paid, through the clearing house, checks drawn upon the M. S. Bank by depositors having amounts to their credit as such sufficient to meet the same. In an action brought by the receivers of the M. S. Bank to recover the securities so deposited or the proceeds thereof, *held*, that the arrangement was in effect a tripartite agreement between the banks and the association, made upon sufficient consideration, which could not be discontinued, nor did the liability of the St. N. Bank cease until after the completion of the exchanges of the morning after the notice; that said provision of the constitution was valid and binding, and was not affected by the provisions of the State Corporation Law (§ 48, chap. 687, Laws of 1892), which forbids the assignment or transfer of property by an insolvent banking corporation with the view of giving a creditor a preference; that the insolvency of the M. S. Bank did not excuse the St. N. Bank from the performance of its obligations to the clearing house banks; and so, that it was entitled to hold and apply the securities in payment of the amount so paid by it.

Among the checks so paid by the St. N. Bank were two drawn August 8, 1893, by the state treasurer on the M. S. Bank, which had state funds on deposit. These checks were on that day deposited by the treasurer with a trust company which kept accounts with two clearing house banks and had its checks cleared through them. Said checks were handed in to said banks a little before ten A. M. of August ninth, and were at once sent with other checks to the clearing house, where the business of clearances commences at ten o'clock. By the general and invariable custom of New York banks, checks received between ten A. M. of the day they bear date and ten A. M. of the next day are passed through the clearing house with the clearances of the morning of the

latter day. It did not appear that the officers of the M. S. Bank knew of the manner in which the state treasurer's checks were deposited, and it appeared that it acted in good faith. *Held,* the presumption was that every check presented in the morning's clearances was held for value; and so, the St. N. Bank was justified in paying the same.

(Argued April 29, 1895; decided May 21, 1895.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made December 14, 1894, which affirmed a judgment in favor of defendant entered upon the report of a referee.

This action was brought to recover from the defendant certain securities which had been deposited by the Madison Square Bank with the St. Nicholas Bank and the proceeds of the securities, which the latter bank had converted into money.

The following facts were found and are either undisputed or proved. In January, 1891, an arrangement was made between the Madison Square Bank and the St. Nicholas Bank (both of them being state banks); by which the latter bank, which was a member of the New York Clearing House Association, became the agent to clear through the clearing house checks drawn upon the Madison Square Bank. The St. Nicholas Bank submitted in writing a memorandum of the conditions on which it would undertake this business for the Madison Square Bank, as follows :

" $50,000 balance to be kept at all times, to be free from interest. An allowance of at rate of 2 per cent per annum shall be allowed on average exceeding this amount. The Madison Square Bank is to keep with this bank $100,000 in approved bills receivable."

In a letter dated January 9, 1891, addressed by the Madison Square Bank to the St. Nicholas Bank, the cashier of the Madison Square Bank says :

" Referring to conversation of our president with your good selves, we would say that we accept the terms and conditions on which your bank agrees to clear for us as per your

memorandum, namely, $50,000 balance to be kept with you at all times free of interest. Interest at 2 per cent per annum to be allowed us on average exceeding that amount. This bank to keep with you $100,000 of approved bills receivable. * * * We enclose copy of a letter addressed by us to the clearing house committee to conform with the requirements of their circular of December 18th last."

The letter to the clearing house committee enclosed a copy of a resolution, signifying the acquiescence of the Madison Square Bank with the terms of the circular and authorizing its cashier to send a check for the annual payment of $200 required of banks clearing through members.

It was verbally agreed between the parties, at the time of the arrangement referred to in said letter of the 9th of January, that other securities of equal value might be substituted from time to time for those first deposited making up the $100,000 of bills receivable.

The Clearing House Association was and is a voluntary association of banks and banking associations of the city of New York. The object of the association, as stated in its constitution, is "the effecting at one place of the daily exchanges between the several associate banks, and the payment at the same place of balances resulting from such exchanges."

The St. Nicholas Bank was a member of the association. The Madison Square Bank was not so.

Section 25 of the constitution was as follows:

"Whenever exchanges shall have been made at the clearing house by previous arrangements between members of the association through one of their number, and banks in the city and vicinity, who are not members, the receiving bank at the clearing house shall in no case discontinue the arrangement without giving previous notice, which notice shall not take effect until the exchanges of the morning following the receipt of such notice shall have been completed."

This section was in force at and before January 9, 1891, and is still in force, and it was known to be so by the Madison Square Bank at the time of the making of this arrangement.

After the making of this arrangement, and on and after the 13th January, 1891, the St. Nicholas Bank made the clearances at the clearing house for the Madison Square Bank up to and including the 8th day of August, 1893, and the Madison Square Bank deposited and kept good, as to amount and value, its deposit of bills receivable with the St. Nicholas Bank and up to some time in July, 1893, kept good its money balance of $50,000 in addition thereto. Some time prior to August 8th, 1893, the St. Nicholas Bank desired to terminate the arrangement for making clearances for the Madison Square Bank. At that date it held, also, certain collateral securities, taken upon loans made upon notes of the Madison Square Bank and by agreement they or their proceeds should be applied to any other obligations of that bank.

On the 8th day of August, 1893, the St. Nicholas Bank gave the notice required by the 25th section, that it would cease to make clearances for the Madison Square Bank. This was served upon the banks constituting the Clearing House Association on that day.

By the terms of section 25 this notice took effect upon the completion of the exchanges at the clearing house on the 9th of August. These clearances were made every day immediately after 10 o'clock, and were completed before 12 o'clock.

The St. Nicholas Bank paid, on the 9th of August, through the clearing house, checks drawn upon the Madison Square Bank by depositors having amounts to meet the same to their credit as depositors on the books of the Madison Square Bank, $372,000. On the 8th day of August, 1893, the Madison Square Bank, after ineffectual efforts to obtain a loan to relieve its immediate necessities, was visited by the clearing house committee and its condition examined; also by an officer of the state banking department. After this examination by the committee of the clearing house their conclusion that the bank was not in a condition to continue business was communicated to the officers and some of the directors of the Madison Square Bank.

The Madison Square Bank did not open for business on the following day. It was, in fact, insolvent on the 8th of August, 1893, and the officers of the St. Nicholas Bank knew before the exchanges were made on the 9th of August that the Madison Square Bank was insolvent, or that its insolvency was imminent and that it had stopped business.

Included in the gross sum of $372,000, the amount of the checks upon the Madison Square Bank, cleared by the St. Nicholas Bank on the 9th of August, were two checks drawn by Elliott Danforth, the treasurer of the state of New York, against funds of the state deposited in the said bank, which checks were signed and dated on the 8th day of August, 1893, and were deposited in banks in the city of New York, which were members of the Clearing House Association, before 10 o'clock on the morning of the 9th of August, 1893, and were by such banks sent to the clearing house on said 9th day of August. The clearance of said checks was regular and according to the usual course of business among the banks constituting said Clearing House Association, notwithstanding the fact that they were not deposited for collection with a clearing house bank until the morning of the 9th day of August, 1893. The St. Nicholas Bank had no knowledge on the 9th day of August, 1893, of any irregularity in regard to the drawing, deposit or transmission to the clearing house of any of the checks going to make up said gross amount of $372,000.

The referee found that the payments of checks on the morning of August 9th, 1893, were in the performance of its contract with the Madison Square Bank and were not made with the intent on the part of either of the banks to give a preference to any creditor of the Madison Square Bank over any other creditor; or in violation of the Corporation Law of the state and he held that the plaintiffs were not entitled to recover any part of the money or securities held by the St. Nicholas Bank.

From the affirmance of the judgment entered upon his report, at the General Term, the plaintiffs have appealed to this court.

*Louis Marshall* for appellant. The St. Nicholas Bank was the agent of the Madison Square Bank in the clearing house, and, as such, was not entitled, after the insolvency of its principal became known to it, to pay any checks drawn upon the latter, and was not bound by its contract or by the rules of the clearing house to make such payment. (*Overman* v. *H. C. Bank*, 30 N. J. L. 61; *M. N. Bank* v. *Bank of Commonwealth*, 139 Mass. 517; *M. Bank* v. *E. Bank*, 101 id. 281; *Bank of North America* v. *Bangs*, 106 id. 441; *M. Bank* v. *Thomson*, 129 id. 438; *E. Bank* v. *Bank of North America*, 132 id. 147; *People* v. *S. N. Bank*, 77 Hun, 181; *F. L. & T. Co.* v. *Wilson*, 139 N. Y. 284; *Weber* v. *Bridgman*, 113 id. 600; Mechem on Agency, § 238; *Minnett* v. *Forrester*, 4 Taunt. 541; *Parker* v. *Smith*, 16 East, 382; *In re Daniels*, 13 Nat. Bank Reg. 46; *Audenried* v. *Bentley*, 8 Allen, 302; *Paxton* v. *Cartney*, 2 F. & F. 48; *Kay* v. *Dewey*, 7 Ad. & El. 409; *Metcalfe* v. *Wallace*, 15 Gray, 210; *Noble* v. *Durell*, 3 T. R. 420; *Raisin* v. *Clark*, 41 Md. 158; *O. C. Bank* v. *Warren*, 18 Barb. 290; *C. Bank* v. *Varnum*, 3 Lans. 90; *Dunham* v. *Dey*, 13 Johns. 40; *Dunham* v. *Gould*, 16 id. 367; *N. Y. F. Ins. Co.* v. *Ely*, 2 Cow. 420; *Cayzer* v. *Taylor*, 10 Gray, 410; *S. Bank* v. *Bank of Republic*, 67 N. Y. 458; *C. E. Bank* v. *N. Bank*, 91 id. 74; *Fuller* v. *Robinson*, 86 id. 306.) Assuming that the contract between the banks, entered into in January, 1891, embodied as one of its terms the rules of the clearing house, and that the latter called for the payment by the St. Nicholas Bank of the checks drawn on the Madison Square Bank after its insolvency became known to the former, the plaintiffs are entitled to recover in this action on the theory that such contract involved the creation of a preference, in violation of section 48 of the Stock Corporation Law. (*Cole* v. *M. I. Co.*, 133 N. Y. 164; *Throop* v. *H. L. Co.*, 125 id. 530; *Kingsley* v. *F. N. Bank of Bath*, 31 Hun, 329; *Robinson* v. *Bank of Attica*, 21 N. Y. 409; *Gillette* v. *Phelps*, 13 id. 119; *Brouwer* v. *Harbeck*, 9 id. 593; *Coursey* v. *Morton*, 132 id. 556.)

*William Allen Butler* for respondent. The arrangement of January, 1891, between the Madison Square Bank, the St. Nicholas Bank and the New York Clearing House Association for the payment by the St. Nicholas Bank, through the exchanges of the clearing house, of checks drawn on the Madison Square Bank, was valid and legal, and the contemporaneous pledge, pursuant to the arrangement and an incident thereof, of $100,000 of bills receivable by the Madison Square Bank as security to protect the St. Nicholas Bank as to such payments, constituted a valid and legal pledge. (Laws of 1882, chap. 409, §§ 186, 187 ; Laws of 1892, chaps. 564, 687.) There was nothing in the arrangement of January, 1891, between the two banks and the Clearing House Association, nor in the agreement, including the arrangement that the Madison Square Bank should keep with the St. Nicholas Bank $100,000 of bills receivable as security, which was in violation of any provision of the law prohibiting transfers by banks. (*Wood* v. *E. R. Co.*, 72 N. Y. 196 ; *V. C. C. Co.* v. *Murtaugh*, 50 id. 314 ; *Cameron* v. *Seaman*, 69 id. 396, 401 ; *Health Dept.* v. *Knoll*, 70 id. 530 ; *Stearns* v. *Gage*, 79 id. 102, 107 ; *Shultz* v. *Hoagland*, 85 id. 464 ; *Grant* v. *Nat. Bank*, 97 U. S. 80 ; *Barbour* v. *Priest*, 103 id. 293 ; *Wakeman* v. *Dalley*, 51 N. Y. 27 ; *Chase* v. *Lord*, 77 id. 1.) The relation created between the Madison Square Bank and the St. Nicholas Bank by the arrangement of January, 1891, was not merely that of principal and agent. It was a contract relation and created contractual obligations, binding upon both banks and inuring to the benefit of all the members of the Clearing House Association, under whose constitution and rules the agreement was made, and was valid and binding in respect to the provision that it should continue until terminated by notice to take effect after the exchanges of the morning following the giving of the notice should be completed. (*E. S. Bank* v. *Davis*, 142 N. Y. 596.) The idea was advanced at the trial that the contract, although valid when made in January, 1891, was "ambulatory," and was renewed from day to day by the substitution of securities, and so was brought under the operation

and inhibition of the Banking Law as to illegal preferences. This is untenable. (*Cook* v. *Tullis*, 18 Wall. 332 ; *Clark* v. *Iselin*, 21 id. 360.) The fact of the insolvency of the Madison Square Bank, whether known to the St. Nicholas Bank or not, worked no change in the contract relation existing between them. (*People* v. *Remington*, 121 N. Y. 328.) The intervening insolvency and closing of the doors of the Madison Square Bank between the time of the giving of the notice by the St. Nicholas Bank on August 8, 1893, and the completion of the exchanges through the clearing house on the morning of August 9, 1893, did not in any way invalidate the payments made by the St. Nicholas Bank in performance of its contract of the checks paid in the exchanges through the clearing house on the morning of August 9, 1893. (Stock Corporation Law, § 48.) The holders of the several checks drawn against funds in the Madison Square Bank by depositors and delivered to the third parties who deposited them in other banks and collected them through the clearances of August 9, 1893, were entitled to such payment and to the benefit of the protection afforded by the securities held by the St. Nicholas Bank. (*Watts* v. *Shipman*, 21 Hun, 598 ; *People* v. *M. & M. Bank*, 73 N. Y. 269 ; *People* v. *S. N. Bank*, 77 Hun, 159.)

Gray, J. The St. Nicholas Bank claims the right to apply the securities and moneys theretofore deposited with it by the Madison Square Bank towards the reimbursement of its payments, or clearances, of the latter's checks on the morning of August 9th, 1893. With respect to that claim the proposition of the plaintiffs is twofold. They say that rule 25 of the clearing house did not require the Saint Nicholas Bank to clear the checks drawn on the Madison Square Bank, presented after it became aware of the insolvency of the latter, and that such insolvency terminated the relation of clearing house agent and rendered any payments made unauthorized ; or, if the clearing house rule is susceptible of the interpretation that it required the Saint Nicholas Bank to honor checks drawn on the

Madison Square Bank after its insolvency became known to it, the contract between the banks, in so far as it contemplated such payment and the use of the securities of the Madison Square Bank to secure the advances made by the Saint Nicholas Bank, was an illegal preference under the statute. The controversy must turn, in my opinion, upon the nature of the relation which existed between the two banks in question and the clearing house and upon what was the extent of the obligation entailed upon the St. Nicholas Bank, in engaging to receive and to clear checks drawn upon the Madison Square Bank, when presented through the clearing house. For the plaintiffs it is argued that, as between the Madison Square Bank and the St. Nicholas Bank, the relation, simply, of principal and agent was created and, therefore, upon the insolvency of the former becoming known, on the morning of the day when clearances of the previous day's checks were to be effected, that the latter bank was not entitled to pay checks drawn upon the former bank. But I think to view the relation as such is altogether incorrect and unwarranted by the facts. In a certain and limited sense the St. Nicholas Bank, of course, would act as an agent, in clearing and paying checks drawn upon the Madison Square Bank. That, however, was a mere feature of that larger contractual relation, into which the two banks had entered with the Clearing House Association, and which characterized all their dealings. The agreement of January, 1891, was one to which there were three parties; each of which was moved to enter into it by a legitimate consideration. The Madison Square Bank acquired the very substantial advantages, which the members of the Clearing House Association enjoyed, in the increased convenience, dispatch and safety of banking transactions. The St. Nicholas Bank acquired advantage, benefit and a protection by the deposit of collateral securities to the amount of $100,000 and of the cash, required to be made by the Madison Square Bank. The cash deposit was to be free of interest and maintained at a daily balance of $50,000. The members of the Clearing House Association, in extending to the Madison Square Bank the right to

have its checks cleared and paid through one of its members, were assured that all checks presented would be paid up to, and including, the day following the giving of notice by the St. Nicholas Bank of the termination of the arrangement between itself and the Madison Square Bank. The learned referee very correctly defines the arrangement between these two banks and the clearing house as constituting a tripartite agreement upon ample consideration, for the mutual benefit of all the parties who entered into it. That agreement provided for the length of its duration; for the maintenance at all times of the stipulated security to protect the St. Nicholas Bank and bound that bank to receive and pay the checks drawn upon the Madison Square Bank as it would its own.

The St. Nicholas Bank could only agree and arrange to clear for the Madison Square Bank, in accordance with conditions imposed by the constitution and rules of the Clearing House Association; and an essential condition was that the arrangement could not be discontinued, nor should its liability cease, until after the completion of the exchanges of the morning next following the receipt of a notice of discontinuance. There was nothing in such a provision of the constitution of the clearing house, which was objectionable, legally speaking, or otherwise. It was perfectly competent for the banks to form themselves into this voluntary association and to agree that they should be governed by a constitution and by rules. When adopted, they expressed the contract by which each member was bound and which measured its rights, duties and liabilities. (*Belton* v. *Hatch*, 109 N. Y. 593.) If not in conflict with rules of law, they must be awarded that effect which is always accorded to the deliberate engagements of parties. The provisions of section 25 of the constitution of the Clearing House Association were designed as a security and a protection for the members, in the event mentioned. When the Madison Square Bank made its arrangement with the St. Nicholas Bank and, also, made compliance with the terms of the demand of the clearing house circular, I think it is clear that a definite contractual relation was at once created between the three

parties; whose provisions and relative engagements were effectually defined and controlled by the constitution and rules of the clearing house, in so far as they touched the proposed clearances of checks. The contract, which bound the members of this voluntary association of banks and regulated their duties, rights and liabilities, permitted the representation of an outside bank, through a member; provided that member assumed a liability, which should not cease, until the completion of clearances on the morning next after its notice of a discontinuance was given. That liability, so exactly provided for, is, however, sought to be limited to cases, where insolvency has not supervened, as to the non-member bank. If the relation here was strictly that of an agent acting for a principal the question might be a serious one; but even then much might be said in favor of the liability which the agent had, with the assent of the principal, assumed. That, however, was not the relation. The Madison Square Bank was a contracting party in an agreement, to which the other parties were the St. Nicholas Bank and the Clearing House Association, and it had accepted and had become bound by provisions in the latter's constitution and rules. That agreement was entered into at a time when it was perfectly competent to make it and its duration was fixed by section 25 of the constitution of the clearing house. As the respondent's counsel says, every bank entitled to the payment of checks sent by it through the exchanges of the clearing house, in due course, had a right to rely upon the liability of any other bank clearing for the non-member and unless this liability continued definitely and up to a certain period, the liability of the clearing bank would not be fixed and enforcible. Here, the effect of the constitution and rules of the clearing house upon the agreement was as though it had been stated, in so many words, that it should commence upon January 13th, 1891, and should be at an end on August 9th, 1893, after the clearances of that day had been completed. What was there in the agreement and its incidents, which contravened any rule of law or of

policy? The plaintiffs say that the effect is to give an illegal
preference under the statute; which, it is meant, would be
accomplished by the payment of checks, after the insolvency
of the non-member bank is known, and by the use by the
clearing bank of the deposited securities in reimbursement
thereof. To that I cannot agree. The statute referred to is
the State Corporation Law (Chap. 687, Laws of 1892);
which, in section forty-eight, contains previously-existing pro-
visions of the Banking Law of this state. The provisions of
the section forbid the assignment or transfer of any property,
"when the corporation is insolvent, or its insolvency is immi-
nent, with the intent of giving a preference to any particular
creditor over other creditors of the corporation." This pro-
vision has no application to such a case as this; where, at the
time when the arrangement was made with the St. Nicholas
Bank, the Madison Square Bank was solvent. It would be
absurd to speak of the agreement of January, 1891, as hav-
ing been made in contemplation of future insolvency, or with
the intent to give a preference to any creditor of the Madison
Square Bank. If there is any presumption respecting the
business engagements of going concerns, it is that they will
be fulfilled; and, when security is exacted, it is as a business
precaution, to compel exact and prompt performance, rather
than a provision in contemplation of insolvency. If it were
otherwise, business transactions, which have for their subject
the accommodation of one corporation by another, in the loan
of money, or the extension of credit, would be seriously embar-
rassed, if not checked. The statute recognizes the right of a
banking corporation to transfer promissory notes, or evidences
of debt, received in the transaction of its ordinary business, to
purchasers for a valuable consideration and it may lawfully do
so in pledge to secure its creditor, when it is in a condition of
solvency. The deposit of securities made by the Madison
Square Bank with the St. Nicholas Bank constituted a lawful
pledge of its assets, to protect the former against any possible
loss in undertaking to clear and pay all checks drawn upon
the latter and sent through the clearing house  The invalidity

of a transfer or assignment of property by a banking corpo-
ration, under the Banking Law, is where it has been made
while in a condition of insolvency, or in contemplation of it,
and with the "intent" of giving a preference.   The "intent"
must exist and be inferable to vitiate the transaction.   In this
connection, our recent decision in *Elmira Savings Bank* v.
*Davis* (142 N. Y. 590) may be referred to; where the ques-
tion involved was whether the preference given to savings
bank deposits by the State Banking Law was in contravention
of the United States National Banking Law; which avoids
transfers, or assignments, or deposits, made with a view to
prefer a creditor.   It was there said, and the observation is
applicable here, that "it is the voluntary act of the national
bank, in contemplation of its insolvency and with the view of
then preventing the ratable application of its property, which
is avoided by the national law.   In the present case, while a
going concern, it entered into an engagement with the savings
bank, which the state law required and regulated; which
vested in the latter superior rights or equities, and which, in
the possible event of future insolvency, would give to it a
prior claim to payment from the assets.   When that event
happened and the receiver was appointed, he took over the
property of the insolvent concern, as trustee for its creditors
and shareholders, under the same conditions as the bank held
it and subject to the right of this plaintiff to be first paid in
full, before other creditors were paid."   So I say here, the
plaintiffs, upon becoming vested as receivers with the prop-
erty of the insolvent Madison Square Bank, held it subject to
all rights lawfully acquired and to all superior · equities;
among which was the right of the St. Nicholas Bank, by
virtue of an agreement, valid in its inception and at all times,
to apply the securities in its possession in reimbursement of
its payments of checks presented through the clearing house
on the morning of August 9th, 1893 ; payments which it was
obliged to make, as well by the rule of commercial honor, as
by force of the obligations imposed by the constitution and
rules of the clearing house.   Nor do the cases of *Overman* v.

*The Bank*, (30 N. J. L. 61) and *Merchants' Bank* v. *Bank of Commonwealth* (139 Mass. 518), referred to, touch this question of the obligation of the clearing bank under the constitution and rules of the clearing house and with reference to which the non-member had contracted — a distinction recognized in the *Overman* case cited.

The plaintiff's counsel suggests a possible illustration of the effect of the construction, which is given to this section of the clearing house constitution.  He says, all the creditors of the Madison Square Bank, becoming aware of its insolvency, might have drawn checks upon their deposits and, if they succeeded in getting them presented by clearing house banks, the St. Nicholas Bank would have been compelled to pay them, to its possible ruin.  The illustration, however, proves nothing. That may be said to have been a risk assumed by the St. Nicholas Bank ; but very much of the business of the land, and especially that portion which is done in Wall street, is conducted upon faith and experience has shown that it has not, in the main, been misplaced.  For such a contingency as counsel suggests, it was necessary that the officers of the Madison Square Bank should have been parties to an immoral and illegal scheme.  The St. Nicholas Bank must be deemed to have contemplated and to have assumed every risk, in undertaking to become responsible for the Madison Square Bank, and to have exercised such reasonable judgment in doing so, and to have taken such security against loss therein, as the practical observation and the business experience of its officers suggested.

The conclusion I have reached is that the insolvency of the Madison Square Bank did not excuse the St. Nicholas Bank from the performance of its obligations towards the clearing house banks.  What rather emphasizes the interest in the question of the right of the St. Nicholas Bank to clear and pay, on August 9th, 1893, all the checks drawn upon the Madison Square Bank and presented by clearing house banks, is the fact that there were four checks, exceeding in the aggregate the sum of $300,000 which were drawn

under somewhat peculiar circumstances. I may refer to
two of them, aggregating $250,000, which were drawn by Mr.
Danforth, then state treasurer, on August 8th, 1893, who had
heard enough, in some way, to take alarm at the situation of
the Madison Square Bank with which were state funds on
deposit. He arranged to deposit them with the Manhattan
Trust Company, which kept accounts with the Chase and the
Continental National Banks and had its checks cleared
through them. The two checks were handed into the two
banks, at a little before ten o'clock of the morning of August
9th, 1893, and were at once sent, with all other checks, to the
clearing house, where the business of clearances commences
to be transacted at ten o'clock. The evidence conclusively
shows that there was nothing unusual in this transaction. It
is the general and invariable custom of the banks in New ·
York city to pass all checks, dated upon the previous day and
received between ten o'clock of that day and ten o'clock in
the morning of the day following, by hand, or by mail,
through the clearing house with the clearances of that morn-
ing. Checks may come in the morning by mail, or may be
brought in by local depositors, before ten o'clock and it is
considered to be regular and in the exercise of business pru-
dence to have them cleared as promptly as the rules allow.
In this case there is nothing to show that the officers of the
Madison Square Bank knew of the manner in which the state
treasurer's checks were deposited for payment by the Man-
hattan Trust Company, or that they had anything to do with
their drawing. It appears that that company acted in good
faith in the matter and Mr. Waterbury, its president, testified
that there was nothing unusual, or contrary to the usual course
of business, in getting Mr. Danforth's checks put promptly
through the clearing house that morning and it is difficult to
see how it would be material, if it was otherwise. As to the
two banks, which acted for the trust company, they appear to
have merely performed their duty to their depositor in passing
the checks severally through the clearing house. Nor can it
be pretended that the St. Nicholas Bank had any knowledge

or notice respecting these checks, or any of the checks, which it paid in its clearances of August 9th. Its officers had no knowledge of the insolvency of the Madison Square Bank until that morning. Its notices of the day previous to the various banks, that it would no longer continue to clear for the Madison Square Bank, were based on a dissatisfaction with its failure to keep good its promised daily cash balance of deposits. Until the clearing house committee completed its examination of the condition of the latter bank, in the afternoon of the eighth of August, it was not known how it stood. The time was one of great excitement and of a distrust in financial circles, which cast its shadow over many banks, and a bank, to justify being assisted by the associated banks, must show itself to possess sufficient resources in the possession of assets of real value. The attention of the clearing house committee being called to the Madison Square Bank, their examination resulted in the advice that it should suspend. They did not decide as to the solvency of the bank. It might resume, if it succeeded in making such arrangements as would put it in the possession of funds by realization upon its assets. However that might be, the bank decided not to open its doors on the following morning. It was affirmatively testified to by the cashier of the St. Nicholas Bank that they had no suspicion of the inability of the Madison Square Bank to continue its business, when sending out notices to other banks; but thought it unsafe to continue clearing for it, in view of its past conduct. If the evidence showed any knowledge in the St. Nicholas Bank as to the particular checks, as to which so much has been urged and which it paid in the clearances of the morning of August 9th, or if it had such notice concerning the designs of their drawers as to make it an abettor in an unlawful scheme to obtain a preference over other creditors, a very different question would be presented. But there was nothing whatever to charge it with any knowledge, or notice, and all the evidence goes to prove that it acted in perfect good faith; and that being so and its payment of checks, passing through

the clearing house on the morning of August 9th, having been made in discharge of the liability resting upon it, under the constitution and rules of the association, it not only could not, but it should not, be made to suffer a loss. The knowledge possessed by it in common with the public, in the morning of August 9th, did not change its position, nor affect its liability. The presumption was that every check presented at the morning's clearances was held for value and it was for the plaintiffs to rebut that presumption and to show that the banks presenting checks were not acting in good faith in what they did, but merely as agents for the drawers in obtaining the funds drawn against. They failed to do so. More than that, the evidence established the contrary, except in the possible instances of the two checks drawn by the Uhlmans; which were two of the four checks I mentioned as taking the clearances of August 9th, 1893, out of the ordinary. I deem it unnecessary to discuss the facts respecting them. The St. Nicholas Bank was in no respect more informed about their making, or their collection, than it was about the other checks. If there was anything irregular concerning them, I agree with the learned referee that the question would affect, not the St. Nicholas Bank, but the right of the bank which presented them to hold their proceeds. If we leave out of consideration the two Uhlman checks, the balance of account is still against the plaintiffs and their action would have to fail any way.

For these reasons, as for those which were well expressed by the very learned referee and with which they are in harmony, I think the judgment below was right and I advise its affirmance here.

All concur, except Andrews, Ch. J., and Peckham, J., dissenting.

Judgment affirmed.