[No. 15636. *En Banc.* May 12, 1920.]

## Louis H. Moore, *State Bank Examiner, on Behalf of the German-American Mercantile Bank, Appellant,* v. American Savings Bank & Trust Company, *Respondent.*[1]

Banks and Banking (41)—Clearing House Associations—Rules as Part of Contract. Where nonmembers of a clearing house asso-.ciation must consent to be governed by the rules of the association in order to obtain benefits of its contract with a member to clear its checks, the rules of the association are a part of the contract.

Same (41)—Clearing House Associations—Contracts—Liability on Checks of Non-member Rules. Under the rules of a clearing house association making a member liable for all checks cleared for a nonmember until delivery of a written notice of discontinuance of the agency, such member is liable to the other members on the checks of a nonmember paid by the other members prior to the receipt of notice of discontinuance; and it is immaterial whether the liability be discharged by payment direct to the other members or to the clearing house association for their benefit.

Same. In such a case, a rule of the association making checks the property of the member presenting the same until paid or "returned," does not authorize the discharge of the liability by a return of good checks regular on their face; since the return of such checks unpaid would be in direct violation of the spirit and rules of the association.

Same. The liability of a member of a clearing house association on checks cleared for a nonmember under rules making it liable until written notice of discontinuance of the agency, is not a liability *in futuro*, attaching after insolvency of the nonmember, where the checks were taken by the other members before notice of the discontinuance, and the day before the nonmember closed its doors for the transaction of business; and hence the same is not violative of the trust fund theory as declared by Rem. Code, § 3303-2, providing that no bank or association shall have a lien or charge for any advance or clearance or liability incurred, against the assets of any bank or business whose property or business has been taken over by the state bank examiner.

Same. In such a case the taking of security from the nonmember to indemnify the member from loss, is not an unlawful preference of a creditor or the creating of any lien by payment made or

[1]Reported in 189 Pac. 1010.

"liability incurred" after insolvency, notwithstanding payment of the clearances was not made until after insolvency; since the legal debt and lien was created the moment the member's liability became fixed on the day before the bank examiner took possession.

Same. In such a case, moneys and securities deposited by the nonmember to be used by the member clearing its checks, do not create merely a guaranty or lien that could in any sense be a violation of the statute or the trust fund theory.

Same. A nonmember of a clearing house association that has deposited money and securities with a member as a guaranty and to secure the benefit of having its checks cleared for it, cannot set up the defense of *ultra vires*, where it was impossible to put the parties in *statu quo*.

Holcomb, C. J., Fullerton, Mitchell and Mackintosh, JJ., dissent.

Appeal from a judgment of the superior court for King county, Tallman, J., entered November 8, 1918, in favor of defendant, in an action by the state bank examiner on behalf of an insolvent bank, after a trial on the merits to the court. Affirmed.

*M. M. Richardson* and *Hugh C. Todd,* for appellant.

*John H. Powell* and *Farrell, Kane & Stratton,* for respondent.

Bridges, J.—This was a suit by the appellant, as state bank examiner, on behalf of the German-American Mercantile Bank, of Seattle, an insolvent corporation, to recover of the respondent certain cash and securities which the German-American Mercantile Bank had theretofore placed in the possession of the respondent.

The Seattle Clearing House is a voluntary association composed of certain, but not all, of the banking institutions in the city of Seattle. The chief purpose of the clearing house is "the effecting at one place of daily exchanges between members." In the transaction of business each bank in the city would receive and pay checks drawn on many or all of the other

banks, and but for the clearing house it would be necessary that each day a representative of each bank personally visit each other bank, taking to it checks drawn upon it. To avoid this, representatives of the members of the clearing house meet at a designated place and at designated hours each business day and exchange checks or other items. Many of the banks in Seattle were not eligible to become, and were not, members of the clearing house. Its rules made provision, however, whereby nonmembers might obtain its benefits. If any such nonmember should so desire, it must act through some member. In other words, a member of the clearing house may clear checks and other items for a nonmember. Article 2 of the clearing house rules covers this subject, and provides that any member may clear for any nonmember only after obtaining the consent of the clearing house committee and paying a certain sum. The member desiring to clear for a nonmember must make a certain showing concerning the financial standing of the nonmember. The latter must consent to be governed by the rules and regulations of the association. This rule further provides as follows:

"Said member shall be liable to the clearing house for all checks and other clearing-house matter upon such non-member, the same as for its own transactions, and its liabilities shall continue until the delivery to each member of the association of a written notice of the discontinuance of such agency, and the clearing member may demand, and shall receive, from each of the other members of the association, a written list of all items then held by them for which the clearing member shall be liable. . . ."

Prior to January 31, 1917, the German-American Mercantile Bank, being a nonmember of the clearing house, made arrangements to clear through the re-

spondent. The agreement between the two banks was correctly expressed by one of the witnesses as follows:

"The agreement between our bank [German-American Bank] and Mr. Gleason's bank [the respondent] in 1914 was that they would clear for us and that we would deposit with them securities to the approximate amount of fifty thousand dollars and maintain with them a balance of approximately fifty thousand dollars in cash at all times.

"The securities that were delivered over were delivered over to protect them against any possibility of any loss through their having agreed to act as clearing-house agent for us. . . . In other words, that money was put up for the purpose of indemnifying the American Savings Bank & Trust Company against any loss which was occasioned to it by the payment of any checks which were drawn upon our bank and which passed through the clearing house, and which were paid by the American Savings Bank & Trust Company."

This arrangement was originally made in 1914. Later, however, the clearing house, in a sense, dissolved; but it at once reorganized, with certain different members, and continued business under substantially the same rules and regulations that had theretofore existed. The clearing arrangements between the two banks continued without interruption and as though there had been no dissolution. On January 31, 1917, at ten o'clock a. m., the German-American Mercantile Bank went into the hands of the state bank examiner for the purpose of being liquidated, it appearing at that time that the bank was insolvent, of which fact the respondent received immediate notice. On the date last named, the German-American Mercantile Bank had with the respondent, in compliance with its clearing agreement, $14,849.22 in cash, and securities the face value of which was $51,763.40. About three-thirty o'clock in the afternoon

of January the 30th, the respondent gave written notice to the other members of the clearing house that it would no longer clear for the German-American Mercantile Bank. Many checks drawn on the German-American Mercantile Bank had been received and cashed by the various members of the clearing house during January the 30th and previous to the time they received the respondent's notice that it would cease to clear for that bank. During the day of January the 31st, and after the bank examiner had taken possession of the German-American Mercantile Bank, the respondent paid to these banks, through the clearing house, the amount of these checks in the sum of $61,651.82. Later the bank examiner brought this suit to recover of the respondent the cash and securities of the German-American Mercantile Bank held by the respondent when the German-American Mercantile Bank became insolvent. There was a judgment for the respondent, and the bank examiner has appealed.

The respondent claims the right to hold the cash and securities to protect itself against the checks of the insolvent bank which it paid on January the 31st in the sum of $61,651.82. There is no charge of fraud or overreaching involved. The case presents some important and difficult questions. It has been ably briefed and argued.

It is first contended by the appellant that the respondent was not legally obligated to pay the checks or the other items making up the sixty-odd thousand dollars, and consequently is not entitled to hold the cash and securities for protection. On the other hand, the respondent contends that it was legally liable for such amount and was required to pay it. It is plain that the contract was a tripartite one, being between the respondent, the German-American Mercantile Bank and the clearing house. It is also clear that the various

rules and regulations of the clearing house became a part of that contract, and the latter must be interpreted in the light of those rules. It is conceded that the checks, the payment of which is involved in this suit, were in the hands of the various member banks at the time the respondent gave notice terminating its clearing arrangements with the German-American Mercantile Bank. If the respondent was legally obligated to pay those checks, then it would be entitled to reimburse itself out of funds and securities it holds belonging to the German-American Mercantile Bank, unless it should be found that, for other reasons, which will later be discussed, such contract is void and unenforceable; otherwise it would be required to surrender the same to the bank examiner. It therefore becomes necessary to determine whether the respondent was legally obligated to pay the checks mentioned. We think it was so obligated. One of the rules of the clearing house, which became a part of the contract which we are discussing, provided that the member clearing for the nonmember

"shall be liable to the clearing house for all checks . . . upon such non-member the same as for its own transactions, and its liabilities shall continue until the delivery to each member . . . of a written notice of the discontinuance of such agency, and the clearing-house member may demand . . . from each of the other members . . . a list of all items then held by them for which the clearing member shall be liable, . . ."

The liability of the respondent to the other members of the association to pay any and all checks which they might receive, drawn on the German-American Mercantile Bank, was a part of the obligation imposed upon it for the privilege of acting as clearing agent for that bank. Checks drawn on the German-American

Mercantile Bank were received and cashed by the members of the association as though they were checks drawn against the respondent. As to such checks, the other members were relieved of all responsibility. In the transaction they did not know the German-American Mercantile Bank. This rule expressly makes the respondent liable to pay checks drawn on the non-member and cashed by the members, and provides a way of terminating such liability. The words are clear and specific. The testimony shows that it has been from time to time so interpreted and construed by the members of the association. It has always been considered that the member clearing for a nonmember is liable to the other members for the checks of the latter. In this very instance the respondent objected to paying the checks in question here and argued to the members of the clearing house that it was not legally bound to pay them. But they were unanimous in the opinion that the respondent was bound to pay those checks. The German-American Mercantile Bank, when it made the clearing house arrangements with the respondent, must have so understood and interpreted the rule; otherwise, why did it put up securities and cash to the respondent, "for the purpose of indemnifying" it "against any loss which was occasioned to it by the payment of any checks which were drawn on our bank"?

But appellant argues that, if the respondent was liable to pay these checks, it was liable only to the clearing house and not to its various members. It seems to us this is a distinction without a substantial difference. The clearing house was nothing more than the members which constituted it. It was not a corporation; it was not a copartnership; it had no legal separate being. A contract with it was a contract with and for the use and benefit of its several members, any

one of whom could, to the extent of its interest, enforce it. The real question, it seems to us, is: Was the respondent liable to pay these checks? and not whether the rule provided that it should pay them directly to the various members of the clearing house, or indirectly to them through that institution. But the appellant contends that, while section 5 of article 2 of the rules, which we have quoted, may, when taken alone, indicate a liability to pay these checks, yet that section must be read in connection with section 2 of article 3 of the rules, which provides that,

"all checks and vouchers received by any member in the exchanges . . . shall remain the property of the members who presented the same respectively at the clearing house, and shall be held in trust only by the members so receiving the same until returned or the amount thereof actually paid to the members who presented the same . . . Should any member fail to pay on demand the balance due, all checks or vouchers received in the exchanges of that day by the defaulting party shall be returned . . . to the clearing house . . ."

It is contended by the appellant that this section authorized the respondent to either pay or to return the checks at its option, and that consequently there was no legal liability to pay. We think the appellant has misconstrued this section of the rules. It has reference only to returning checks which for some reason were not good, such as because the same were irregular on their face, or were forged, or the funds had been previously garnished, or because of some other similar irregularity or reason. It does not mean that a solvent member of the clearing house may return checks against which there are no equities and no defenses, and which it was liable to pay. Other rules refer to irregular checks such as we have mentioned, and section 5 of article 2 of the rules has reference

to such class of checks. The rule makes respondent liable for "good" checks drawn against the German-American Mercantile Bank, as it would be liable for its own checks; and to permit it to return such checks unpaid would be in direct violation of the spirit of the association and its rules. Such an act by the respondent would be equal to a repudiation of its own paper and an act of insolvency which would at once close its doors. We hold that the respondent was not only morally, but legally bound to the clearing house and its members to pay the checks involved in this case, and that, when it paid them, it did only that which its contract bound and required it to do.

But the appellant contends that, if the contract is to be given this construction, then it is void and unenforceable in this instance, because violative of the trust fund theory of insolvent corporations and in direct opposition to section 2, chapter 98, Laws of 1915, p. 280 (Rem. Code, § 3303-2). That section provides as follows:

"No bank, trust company, association or individual knowing that the state bank examiner has taken possession of such bank or trust company shall have a lien or charge for any payment advanced or any clearance thereafter made, or liability thereafter incurred, against any of the assets of the bank or trust company of whose property and business the state bank examiner shall have taken possession."

It seems to be conceded that this statute embraces the trust fund theory developed by the decisions of this and other courts. Plainly, it prohibits a lien for (1) a payment advanced after insolvency; (2) a clearance made after insolvency; and (3) a liability incurred after insolvency. This statute is but a legislative expression of the trust fund theory. Its purpose is to hold the funds of an insolvent corporation for all the

creditors; to prohibit the preferences which an insolvent individual may lawfully give. The appellant asserts that whatever liability might exist under the contract was a liability *in futuro;* that the rights of all persons must be determined according to the facts, rights and liabilities as they exist at the moment the bank goes into the hands of the examiner; and that at that moment the respondent had no lien, because it had made no payment, and that it could not pay after insolvency and thereby create a lien, because such would violate the statute. It is clear, we think, that the respondent's liability to pay these checks had been incurred prior to insolvency. Under the rules of the association, its liability to pay existed from the moment it began to clear for the German-American Mercantile Bank, down to the moment it gave notice terminating that arrangement. All the checks involved were received by the other member banks before this notice was given and before the German-American Mercantile Bank closed its doors for business. Doubtless, under the rules and under the custom and practice, the respondent might have paid these checks at the time it gave the notice terminating the clearing arrangement; and if it had so done, such act would not have violated any provision of the statute, because both the liability would have been incurred and the payment made before the act of insolvency. Is it possible, therefore, that, because the respondent did not pay the obligation it has incurred the moment it was due, but paid it the next day, this is a violation of the terms of the statute? This would seem to be splitting hairs. The German-American Mercantile Bank, when it was solvent, had a right to make a contract to clear its checks and other items through the respondent; and it had a right at that time to put up to the respondent collateral security to indemnify the latter against any

loss. What is there, then, in the statute, or in the doctrine of the trust fund theory, which would make this contract, valid when made, void simply because the German-American Mercantile Bank had become insolvent, and simply because circumstances had arisen where the respondent had need of the security and its protection? That the respondent's liability as to amount, time payable, and to whom payable, became fixed and was "incurred" the day before the bank closed its doors, we think is unquestioned. But it is said the payment was not made until after the insolvency, and therefore the lien mentioned by the statute was not created until after insolvency. We do not agree with this proposition. If the lien was not created in 1914, when the contract was made, certainly it attached the moment respondent's liability became fixed—which was the day before the examiner took possession. The legal debt of the respondent, its immediate liability to pay it, and the creation of the lien were simultaneous. We do not find in this situation any unlawful preference of creditors or any creating of a lien by "payment" made or liability "incurred" after insolvency. The insolvency of the bank and the taking possession by the examiner could not destroy nor affect this lien. He would take possession of the bank subject to all equities and rights existing in any one else. In 34 Cyc. at page 193, it is said:

"The general rule is that a receiver takes the property of which he has been appointed in the same plight and condition and subject to the same equities and liens as he finds it in the hands of the person or corporation out of whose possession it is taken."

In 23 R. C. L., at page 56, it is said:

"A receiver holds the property coming into his hands by the same right and title as the person for whose property he is receiver, subject to liens, prior-

ities, and equities existing at the time of his appointment. He becomes merely the assignee of the insolvent, and has exactly the same rights.''

Practically all of the questions involved in this litigation were involved in the cases of *O'Brien v. Grant,* 146 N. Y. 163, 40 N. E. 871, 28 L. R. A. 361; and *Davenport v. National Bank of Commerce,* 127 App. Div. 391, 112 N. Y. Supp. 291, 88 N. E. 1117. We will not extend this opinion by reciting the facts in either of those cases, because they are almost identical with those here. In the *O'Brien* casè, the St. Nicholas Bank, a member of the New York clearing house, was clearing for the Madison Square Bank, which was a nonmember. The same kind of a suit was brought there as here, and for the same purpose. The court said:

''The members of the Clearing-House Association, in extending to the Madison Square Bank the right to have its checks cleared and paid through one of its members, were assured that all checks presented would be paid up to, and including, the day following the giving of notice by the St. Nicholas Bank of the termination of the arrangement between itself and the Madison Square Bank. . . . That agreement provided for the length of its duration, for the maintenance at all times of the stipulated security to protect the St. Nicholas Bank, and bound that bank to receive and pay the checks drawn upon the Madison Square Bank as it would its own. . . .''

The court further held that there would not be any unlawful preference and that such a contract would not violate any trust fund rule.

In the *Davenport* case, the Bank of Staten Island was clearing through the National Bank of Commerce. The court said:

''The plaintiff contends that the defendant ought not to have paid any of the checks that were presented

to it; that its officers had knowledge of the taking of possession by the superintendent of banks the day before. Hence it paid with knowledge that thereby the drawers of the checks would obtain a preference over other depositors, . . . So far as the defendant was concerned, it had in fact no choice. It was a member of the clearing house association. As such, it had bound itself to pay all checks of the Bank of Staten Island, or any other non-member bank for which it cleared, until after the exchanges of the morning following a notice that it would not longer clear for such bank. . . . And it had no more right, in view of its engagements with its associate members in the clearing house association to refuse to pay checks presented in the clearing house on the morning following the giving of the notice, than it had to refuse to pay checks drawn upon it by its depositors. In paying the checks, therefore, it did only what it was bound to do and could be compelled to do.''

The case has been briefed and argued solely upon the theory that the respondent had guaranteed to the member banks the payment of checks paid by them and drawn on the German-American Mercantile Bank, and that it was to have a lien on the funds and securities to protect it under its guaranty. But it may well be doubted whether there is in the case any question of guaranty or lien. Under the rules, the members did not know the German-American Mercantile Bank. Checks drawn against it were, in effect, checks drawn against the respondent. The respondent was to pay, not guarantee, checks drawn against the German-American Mercantile Bank and cashed by the other banks. In this manner the money and securities deposited with the respondent were to be used to make those payments. In other words, the respondent was to pay these checks out of the money deposited with it, and if there was at any time not sufficient money for that purpose, the securities could be converted

into cash. Under this theory, the statute and trust fund theory would be inapplicable. This theory of the case was adopted in the case of *Davenport v. National Bank of Commerce, supra,* where it was said:

"The legal effect of those agreements, as well as the one under consideration, was to require the member bank clearing for said Bank of Staten Island to pay all the checks drawn upon the latter when presented through the clearing house. . . . On the other hand, the agreement in legal effect authorized the clearing bank to use the moneys deposited in pursuance of it to meet such checks, and in addition, to collect or sell the bills receivable or other collateral when necessary to pay the checks redeemed by it that were in excess of the amount of moneys on deposit."

Whatever view we may take seems to lead to the conclusion that the respondent has a right to protect itself out of the moneys and securities deposited with it.

It is contended, however, that the German-American Mercantile Bank had no right or authority under its charter to put up with the respondent cash and collateral security, and thus deprive its creditors of some of its assets; and that such act was *ultra vires.* Many cases are cited by the appellant in support of this argument, and it must be said that, apparently, some of them do support it. But such is not the rule in this state. Under the facts in this case, it is clearly immaterial whether the German-American Mercantile Bank exceeded its powers in putting up cash and collateral security to the respondent, and whether that act was or was not *ultra vires.* The fact still remains that that bank desired to obtain the benefits which would flow to it as a result of having its business pass through the Seattle clearing house, and in order to obtain these benefits actually put up the cash and collateral security and maintained it for a number of years, and received

the benefits which it sought; and the respondent has been compelled to pay, and has paid, the penalty for having cleared for it. The parties cannot be put *in statu quo.* Under these circumstances, this court will not permit the bank examiner to successfully defend on the doctrine of *ultra vires.* In the case of *Creditors Claim & Adjustment Co. v. Northwest Loan & Trust Co.,* 81 Wash. 247, 142 Pac. 670, Ann. Cas. 1916D 551, L. R. A. 1917A 737, the facts were the following: Certain customers of the respondent bank desired to purchase certain material. The seller of the material required some guaranty of payment. The bank furnished this guaranty. Later, it was sued thereon. It was claimed by the bank that it had no authority under the statute to guarantee the payment of the account, and that its act was *ultra vires;* but this court, speaking through Judge Morris, said:

"The defense of *ultra vires* is one with which the courts have had much trouble in attempting to compel some corporations to live up to their contracts, and much has been said that is hard to reconcile. Many cases, among which may be classed those from this state, have refused to recognize this defense, where the contract has been fully executed and where in its performance one party has received and retained a benefit or the other has suffered a detriment and cannot be placed *in statu quo.*"

The court reviews many of the authorities and quotes with approval the following from *State Board of Agriculture v. Citizens' St. R. Co.,* 47 Ind. 407, 17 Am. Rep. 702:

" 'Although there may be a defect of power in the corporation to make a contract, yet if a contract made by it is not in violation of its charter or of any statute prohibiting it, and the corporation has by its promise induced a party relying on the promise, and in execu-

tion of the contract, to accept money and perform his part thereof, the corporation is liable on the contract'."

Such has been the accepted doctrine of this court almost from its beginning, and we think such doctrine is wholesome and should be enlarged, rather than contracted.

Judgment affirmed.

TOLMAN, PARKER, MOUNT, and MAIN, JJ., concur.

HOLCOMB, C. J. (dissenting)—We dissent. The effect of this decision is to render the rules and operations of the Seattle Clearing House Association superior to the provisions of section 2, chapter 98, page 280, Laws of 1915 (Rem. Code, § 3303-2), and virtually to nullify that statute. It would appear to have been the manifest intent of the legislature to comprehend just such a situation as this. If not, there was small benefit to be derived from the statute.

By the agreement between the nonmember bank and the member bank and the clearing house rules, the trust fund law of this state and the positive statutes for the regulation of banking business and the protection of creditors generally of insolvent banks are completely evaded and overridden. Such inconsistency in the law is indefensible.

Nor do we think the New York cases (*O'Brien v. Grant*, 146 N. Y. 163, 40 N. E. 871, 28 L. R. A. 361; *O'Brien v. East River Bridge Co.*, 161 N. Y. 539, 56 N. E. 74; and *Davenport v. National Bank of Commerce*, 127 App. Div. 391, 112 N. Y. Supp. 291, 88 N. E. 1117) are exactly parallel as construing precisely such statutory provisions as ours, no such identical statutory terms being quoted or referred to in the opinions. If so, however, we are unable to concur with those decisions. In those decisions a statute of New York was

quoted in the *O'Brien* cases and referred to in the *Davenport* case, forbidding the assignment or transfer of any property "when the corporation is insolvent, or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation." But our statute provides that:

"*No bank,* trust company, association or individual knowing that the state bank examiner has taken possession of such bank or trust company *shall have a lien or charge for any payment advanced or any clearance thereafter made, or liability thereafter incurred,* against any of the assets of the bank or trust company of whose property and business the state bank examiner shall have taken possession." Rem. Code, § 3303-2.

We have italicized the terms of our statute which compel us to conclude that it controls in such case as this, notwithstanding the clearing house association rules, and notwithstanding the New York decisions. There, *intent to prefer* creditors was an essential element prohibited. Here, intent is immaterial. Manifestly, by the majority opinion, either a lien is impressed upon the fund deposited by the nonmember bank with the clearing house bank, under their contract and the association rules, or an indemnity allowed for "*any payment advanced,*" or "clearance *thereafter* made, or liability thereafter incurred."

Nor do we agree with the observations made respecting the lack of application of the principle of *ultra vires.* We doubt if it is necessarily involved; but, at any rate, while, under the case cited and another which might have been cited, *United States Fidelity & Guaranty Co. v. Cascade Const. Co.,* 106 Wash. 478, 180 Pac. 463, the corporation itself probably should not be permitted to invoke that principle, others, who were

not parties to the corporate act, especially creditors, certainly would be permitted to do so.

The judgment should be reversed.

Fullerton, Mitchell, and Mackintosh, JJ., concur with Holcomb, C. J.