HARRIS v. YOUNGSTOWN BRIDGE CO. et al. LOUISVILLE TRUST CO. v. SAME. COLUMBIA FINANCE & TRUST CO. v. SAME. GAULBERT et al. v. SAME. CENTRAL THOMSON–HOUSTON CO. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. November 9, 1898.)

Nos. 503–506, 519.

1. CORPORATIONS—MORTGAGES—AFTER-ACQUIRED PROPERTY CLAUSE.
    An after-acquired property clause in a mortgage given by a corporation attaches to property to which the mortgagor subsequently acquires either the legal or equitable title, but subject to the limitation that the mortgagee is not a purchaser for value as to such property, and can take by way of lien no greater interest than that acquired by the mortgagor itself; and his lien is subject to all known liens or equities, valid against the mortgagor, which arise in the act of purchase or acquisition, and which qualify the scope and extent of its ownership.

2. SAME—PROPERTY PAID FOR BY THIRD PARTY.
    A corporation issued bonds secured by a mortgage on its property, and also covering after-acquired property. It subsequently made additions to its property not contemplated when the mortgage was given, the money for which was furnished by a third party under a contract by which the corporation agreed to, and did before the property was conveyed to it, execute its bonds to such third party, secured by mortgage on the property so obtained. Held, it appearing that the transaction was in good faith, that the lien of such mortgage was superior to that of the first mortgage.

**3. SAME—RIGHT OF WAY IN STREETS—IMPROVEMENT BY THIRD PARTY.**

Such second mortgage, however, did not attach as a first lien to rights of way in streets granted to the corporation by municipal ordinances, or by individuals over their property, for a nominal consideration, nor to improvements thereon made by the mortgagee, though both were expressly included in the mortgage, and the improvement was necessary to prevent a forfeiture of the grants. The title to such rights of way, as realty, passed to the corporation at once on the passage of the ordinances or the making of the deeds, and became subject to the first mortgage, under the after-acquired property clause; and the lien for the tracks and improvements subsequently placed thereon by the second mortgagee, which became a part of the realty, did not arise out of the act of acquisition by the corporation.

**4. SAME—PRIORITY OF LIENS.**

A bridge company, which had executed a mortgage on its property, containing an after-acquired clause, made a contract with a trust company by which the latter agreed to purchase for the former land upon which to build new approaches to its bridge, and to pay the consequential damages which might accrue by reason thereof; the title to be conveyed to the bridge company upon repayment of the sums so expended. The contract further undertook to create liens upon the property, subject to the rights of the trust company, in favor of persons who should furnish the money to build the approaches. *Held*, upon a foreclosure of liens against the property of the bridge company, that the title of such company to the approaches was subject to the payment of the amount due the trust company, but that on its payment the property at once became subject to the first mortgage, and the contract was ineffective to displace such mortgage in favor of the liens for money expended in the improvement; the interest which was thus subjected to such liens being the interest of the bridge company, and not that of the trust company.

**5. SAME—MECHANICS' LIENS.**

A mechanic's lien for work and materials furnished for the building of the approaches under a contract with the bridge company, based on the mechanic's lien law of Kentucky of 1888, which gives a right to a lien "on the property and franchises of the owner and owners thereof," attached only to the equitable interest of the bridge company, and not to that of the trust company, to which it is subordinate; but, under the provisions of the statute that such lien upon the structure shall be prior in right to mortgages theretofore and thereafter created upon the land, it takes precedence of the liens created by the contract between the two companies in favor of those furnishing money to aid in building the improvement.

**6. MECHANICS' LIENS—CONSTRUCTION OF CONTRACT—WAIVER OF RIGHT TO LIEN.**

A contract for making improvements on property lying in two states, for a lump sum, and providing for the execution of notes for such sum, secured by collaterals, some of which notes did not mature within the time in which suits to enforce a mechanic's lien were required to be brought, is inconsistent with an intention that a right to such lien should exist, and an implied waiver of such right.

**7. CORPORATIONS—FORECLOSURE OF LIENS—METHOD OF SALE OF PROPERTY.**

Where it becomes necessary to decree the sale of the property of a corporation which is subject to divisional mortgages or liens, each of which constitutes a first lien on one part, and a subordinate lien on others, it is proper to direct that such parts shall be offered separately, and then the property as a whole, the bid or bids which will realize the larger sum to be accepted, and, if sold as a whole, to distribute the proceeds in proportion to the value of the different parts as established by the separate bids.

Appeals from the Circuit Court of the United States for the District of Kentucky.

Judson Harmon and Thos. W. Bullitt, for Theo. Harris.

St. John Boyle, for Louisville Trust Co.

W. O. Harris, for Kentucky Nat. Bank.

A. P. Humphrey, for Youngstown Bridge Co.

E. T. Trabue, for Columbia Finance & Trust Co.

W. M. Bullitt, for Gaulbert and others.

Helm Bruce, for Central Trust Co.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

TAFT, Circuit Judge. This action in equity was begun in the circuit court for the district of Kentucky by the complainant the Youngstown Bridge Company to foreclose a mechanic's lien asserted by it upon the bridge and approaches of the Kentucky & Indiana Bridge Company. The parties defendant to the bill included the Kentucky & Indiana Bridge Company; John H. Stotsonberg and Alexander Dowling, trustees under a first mortgage given by the company upon the bridge; the Louisville Trust Company, trustee under a second mortgage; Theodore Harris, trustee under a terminal deed of trust; and the Columbia Finance & Trust Company, claiming a lien upon a part of the bridge under another deed of trust. J. W. Gaulbert and others by intervening petition claimed a lien under the same deed of trust as that upon which the claim of the Columbia Finance & Trust Company was founded; and the Central Thomson-Houston Company, by intervening petition, claimed a mechanic's lien for the furnishing of an electric railway plant to the bridge company. The decree for sale by the circuit court directed the sale of the bridge and its approaches as an entirety, and marshaled the liens. This appeal questions the action of the circuit court in its adjustment of the priorities of the various liens, in its denying the existence of one of the asserted liens, and in its ordering the sale of the bridge and its approaches as an entirety.

The Kentucky & Indiana Bridge Company was the result of a consolidation of an Indiana company and a Kentucky company bearing the same name. In 1881 the consolidated and the two constituent companies issued a mortgage upon the bridge and its approaches, and upon all its after-acquired property, to secure $1,000,000 of bonds of the consolidated company. The bridge was built to connect the cities of New Albany, Ind., and Louisville, Ky., and was intended for steam-railway, street-railway, and wagon transportation, and foot passengers. The original construction included an approach on the Kentucky side, built of wood, and a railway extending from the south end of the bridge, west of Louisville, to Fourteenth street, in that city, where a connection was made with the line of the Short-Route Transfer Railway Company. The bridge as thus constructed is known as "the bridge and the main line." In 1886, for the purpose of securing the Ohio & Mississippi Railway Company as a tenant, the bridge company agreed to connect the bridge with other railroads in the city of Louisville, and to reconstruct the wooden approach by a steel structure. The company had no funds, but succeeded in procuring these

additions and improvements to the bridge and railway by two trust deeds hereafter described. Under a so-called "terminal trust deed" to Theodore Harris, trustee, land was purchased, and a track was built several miles in length, connecting the bridge with the Chesapeake & Ohio Southwestern and the Louisville & Nashville Railroads, and a freight yard was established on the line. Another track was built, connecting the main line of the bridge with the Monon and Ohio & Mississippi Railway terminals. Under this deed an indebtedness of $400,000, evidenced by negotiable bonds, was contracted, for which a lien prior to the first mortgage bonds is claimed upon the railway, the freight-yard structures, and the approaches built in accordance with its provisions. Under the trust contract with the Columbia Finance & Trust Company, land was bought, and a new steel approach substituted for the old wooden one, in the main line. In the construction of this steel approach the debt was contracted for which the Youngstown Bridge Company claims a mechanic's lien. The claim of the Columbia Finance & Trust Company arises out of the money advanced to buy the land for this approach, and a lien upon the land bought is asserted, prior in right to that of the first mortgage upon the bridge. The property has been ordered to be sold, subject to the lien of the first mortgage, but the trustees under that mortgage were made parties in order to be heard on the question of priority between them and the trustee under the terminal trust deed.

The issues which arise for decision are: (1) Is the lien of Theodore Harris, trustee under the terminal trust mortgage upon the new approaches and connections described therein, prior in right to that which the first mortgage bondholders have upon the same property by virtue of the after-acquired property clause in their mortgage? (2) Is the lien of the Columbia Finance & Trust Company upon the land and structure upon which the new steel approach in the main line was built prior in right to that of the first mortgage? (3) Is the lien of J. W. Gaulbert and others upon the new steel approach prior to the first mortgage? (4) Is the lien of the Youngstown Bridge Company prior in right to that of Gaulbert and others? (5) Has the Thomson-Houston Company any mechanic's lien whatever upon the property of the bridge? (6) Should the circuit court have ordered the bridge and all the approaches and terminals sold as an entirety? We shall consider these questions in their order.

1. The first mortgage conveyed the bridge of the company to Dowling and Stotsonberg, trustees, by the following description:

"Its lands, bridge piers, abutments, toll houses, approaches, and all the property, real, personal, and mixed, wherever situated, and all its rights, privileges, franchises, immunities, owned or possessed, or which may be hereafter acquired, by it, * * * and which may be acquired by further legislation, or in any manner whatever."

The bonds issued under this mortgage had been sold and were all outstanding prior to October, 1886. The bridge and its main line were completed in the summer of 1886. The railway and approaches acquired under the terminal trust deed for the purpose of complying with the Ohio & Mississippi Railway contract were secured and constructed in the fall of 1886 and the spring of 1887. This was done in accordance

with a contract between the bridge company and the Southwestern Contract & Construction Company, in which the contract company undertook, with the bridge company, by purchase or otherwise: To acquire the right of way for a connection with the Chesapeake, Ohio & Southwestern Railway and the Louisville & Nashville Railroad at points south of Maple street; the precise location within the limits named to be fixed by the bridge company. To acquire in fee, for the use and benefit of the bridge company, such amount of land as might be esteemed by the bridge company necessary for its yards, yarding, machine shops, repair shops, roundhouses, station buildings, and other terminal facilities, not exceeding 30 acres; the same to be upon the line of railroad already provided for, and upon such points of the line as the bridge company might direct. To grade the roadway, and construct thereon a double-track railroad, making its connection with said railroads at such points, and of such lengths, as might be designated by the bridge company, not exceeding in the aggregate one mile in length; the entire work to be done in accordance with the specifications mentioned in the contract. To acquire the right of way for a double-track railroad from a point between Fifteenth and Seventeenth streets, on the line of said bridge company's existing railway, in the city of Louisville, to a connection of the tracks of the Louisville, New Albany & Chicago Railroad Company and the Ohio & Mississippi Railroad Company, on or near Fourteenth street, and south of Portland avenue, together with such switches as might be required by the bridge company, and to construct thereon a double-track railroad. The entire construction was to be in accordance with the plans and under the supervision of the chief engineer of said bridge company. The bridge company, on its part, agreed to permit the use of its name for the condemnation of any property necessary to the acquisition of such rights of way. The contract company agreed to pay for all the necessary rights of way and land condemned or purchased, and all labor and material, and to cause the same to be conveyed to the bridge company free from lien or claim thereon by any person, excepting only the lien of the terminal deed of trust, hereafter described; and in consideration of the promise the bridge company bound itself to deliver to the contract company, immediately upon the execution of the contract, its negotiable coupon bonds, 400 in number, aggregating in amount $400,000.

The contract provided that the payment of the bonds should be secured by a terminal deed of trust, in which the lands, rights of way, buildings, and all the appurtenances thereto, should be conveyed to Theodore Harris, as trustee, and should be further secured by a similar deed of trust to be executed by the bridge company, conveying by mortgage to Theodore Harris, trustee, the main-line approach of the bridge company, and all other branch lines extending therefrom, to connect with other railroads or depots in the city of Louisville, and all terminal facilities connected therewith. The deed of trust in pursuance of this contract was made on the 1st of December, 1886, between the Kentucky & Indiana Bridge Company, the Southwestern Contract & Bridge Company, E. F. Trabue, trustee (in whose name much of the real estate was acquired by the contract company), and Theodore Har-

ris, trustee. After reciting the contract, and the fact that the parties had begun its execution, and setting out the form of negotiable bonds issued by the bridge company, the deed is declared to be "for the use and benefit of the persons who may at any time become the holders of said bonds or coupons." Subject to the lien of the conveyance theretofore made to Theodore Harris, trustee, for the purposes and trusts set forth therein, the said E. F. Trabue, trustee, and said contract company, granted and conveyed to the Kentucky & Indiana Bridge Company the entire lands and rights of way in the deed described or mentioned, with all structures and improvements then existing or thereafter to be erected hereon, excepting only the existing line of railway connecting said bridge with the Short-Route Railway Transfer Company, which was already vested in said bridge company.

The contract company was originally organized in 1881, at the instance of the directors of the bridge company, to build the bridge for the bridge company, in consideration of a large amount of the first mortgage bonds and the capital stock of the bridge company. The contract company complied with the contract, and built the bridge. It seems to have taken contracts from other companies for construction. The company was run by its president and secretary, who made contracts in its name, from time to time, without calling a meeting of its directors. Between 1884 and 1888 it does not appear that any directors' meeting was called. In 1888, however, the board of directors confirmed all the contracts made by its president. The capital stock of the construction company was $10,000. It does not appear from the record that at the time of the making of this contract, or indeed at any other time, the stockholders of the contract company and the bridge company were the same, except as it may be inferred from the fact that part of the contract price for building the bridge received by the contract company was stock in the bridge company. The two companies did not have the same officers, and, so far as appears, they did not have the same directors. The bonds under the terminal trust deed were delivered at the time of the execution of the deed, and not at the time of the execution of the contract. When the deed was executed the contract company had already purchased, and had taken in its name, or that of Trabue, trustee, 30 acres of land afterwards used for freight yards, and about one-half of the private property needed as a right of way for the proposed improvements; and, from the recitals of the deed, we may infer that the work of laying the track and making other improvements had been under way for some time. It is agreed as a fact that Theodore Harris, the trustee under the terminal trust deed, was not advised, either at the time of receiving the deed or afterwards, of any facts conducing to show that the contract company and the bridge company were otherwise than independent corporations contracting in good faith with each other in manner and form as provided by the deed of October 1, 1886, and that all the bonds were sold for value before this action began. The new railway approaches were 26,609 feet in length. Of this, 8,300 feet was laid upon the streets and alleys of the city of Louisville, under ordinances granting to the bridge company the right to occupy them with tracks. An additional 2,864 feet was laid along the streets in Parkland, a suburban

town, under similar ordinances.  7,135 feet was laid upon private property, which had been either condemned in the name of the bridge company, or conveyed directly to it,—some of it by gift, and some by purchase.  680 feet of track was laid on land that has never been paid for or conveyed.  Thus, the total length of 18,299 feet, or about two-thirds, was constructed upon rights of way which were conveyed directly to the bridge company.  The remaining one-third of the right of way was conveyed either to the contract company, or to E. F. Trabue, trustee.

It is well settled, since the decision of the supreme court of the United States in Pennock v. Coe, 23 How. 117, that one may execute a mortgage, valid at least in equity, upon property not in existence or not owned by him, the lien of which will immediately attach to the property when it shall come into existence, or become the property of the mortgagor; and this whether the title of the mortgagor is legal or equitable.  The rule has been applied both to real and to personal property.  Dunham v. Railway Co., 1 Wall. 254, 266; Railroad Co. v. Cowdrey, 11 Wall. 459, 481; U. S. v. New Orleans R. R., 12 Wall. 362; Dillon v. Barnard, 21 Wall. 430, 440; Fosdick v. Schall, 99 U. S. 235, 251; Myer v. Car Co., 102 U. S. 1; Porter v. Steel Co., 122 U. S. 267, 283, 7 Sup. Ct. 1206; Thompson v. Railroad Co., 132 U. S. 68, 74, 10 Sup. Ct. 29; Railroad Co. v. Hamilton, 134 U. S. 296, 10 Sup. Ct. 546; Trust Co. v. Kneeland, 138 U. S. 414, 423, 11 Sup. Ct. 357; McGourkey v. Railway Co., 146 U. S. 536, 567, 13 Sup. Ct. 170; Wade v. Railroad Co., 149 U. S. 327, 341, 13 Sup. Ct. 892; Irrigation Co. v. Garland, 164 U. S. 1, 17 Sup. Ct. 7.  The limitations of the rule are clearly drawn in the foregoing cases.  The chief is that the mortgagee of after-acquired property is not a purchaser for value, and cannot acquire an interest by way of lien greater than that which the mortgagor has himself acquired.  The lien of the mortgage attaches to after-acquired property in the condition in which the mortgagor takes it from his vendor, and subject to all known liens and equities valid against the vendor. and also subject to all liens or equities valid against the vendee and mortgagor which arise in the act of purchase or acquisition, and therefore necessarily qualify its scope and extent.  Thus, a vendor's lien on the property, good against the mortgagor, is prior in right to that of the mortgagee under an after-acquired property clause.  So, too, a purchase-money mortgage upon after-acquired property is not displaced by the lien of a prior mortgage of the mortgagor containing an after-acquired property clause, because in equity the purchaser is regarded as taking only the difference between the value of the property and the amount still due on the price.  U. S. v. New Orleans R. R., 12 Wall. 362.  In cases of conditional sales to the mortgagor, the mortgagee, under the after-acquired property clause, obtains a lien subject to the same defeasance or forfeiture as that to which the title of his mortgagor is subject.  Fosdick v. Schall, 99 U. S. 235, 251; Myer v. Car Co., 102 U. S. 1; Trust Co. v. Groome, 2 U. S. App. 95, 105, 1 C. C. A. 133, 48 Fed. 868; Loomis v. Railroad Co., 17 Fed. 301, 305.  And it is even held that if the property comes into the hands of the mortgagor subject to a lien which is good against him, though, for want of formalities, it is not good against his subsequently attach-

ing creditors and third persons, it is nevertheless prior to the lien of a mortgagee under an after-acquired property clause. And so, where the legal or equitable title of the mortgagor ripens and is acquired only through the outlay or expenditure of another, under such circumstances that, as between the other and the mortgagor, the former has a lien in equity upon the interest of the latter, the prior mortgage with an after acquired property clause attaches only to the interest of the mortgagor subject to the same lien. Irrigation Co. v. Garland, 164 U. S. 1, 17 Sup. Ct. 7; Botsford v. Railroad Co., 41 Conn. 454. Where, therefore, at the instance of the mortgagor, a third person pays the purchase money for additions, and takes title to them himself, or directs their conveyance directly to the mortgagor, with an express agreement that he shall have a lien for the purchase money, such lien is prior to that of the mortgagor, because it is only through his expenditure that the purchase is effected and the addition acquired. This is not a fraud upon the mortgagee, or a violation of any right of his, in any case where the mortgagor is under no affirmative obligation to the mortgagee to acquire additions to the property, or to acquire them free of lien. It may very well be that, unless the purchase money is secured by a first lien, no addition will be acquired. The security of the first mortgage is increased by the difference between the value of the addition bought, and the part of the price which the mortgagor did not pay. It is not perceived what prejudice the mortgagee suffers by the transaction. His security is certainly not worse, and it may be a great deal better, than before. Nor do we perceive that it destroys the lien that the debt contracted by the mortgagor for the purchase money is evidenced by negotiable bonds secured by mortgage delivered before the land is transferred. The bonds and mortgage are intended to represent, and do represent, a lien growing out of the acquisition of the lands, and the future holders of them are only the assignees of a purchase-money lien. So long as the lien asserted is for money used in good faith to acquire the very thing upon which the lien is claimed, we do not see how the first mortgagee is defrauded. When, however, that which is given the appearance of a vendor's or purchase-money lien is really only a device to secure money borrowed for other purposes of the mortgagor than the buying of the addition in question, then the attempt to supplant the first lien of the mortgage under the after-acquired property clause is a fraud upon the mortgage, and the pseudo purchase-money lien must be postponed to that of the mortgage.

It is urged upon the court that such a conclusion as that just reached will make it possible to commit great frauds upon first mortgage bondholders. It is said that most first mortgage bonds are issued in advance of the acquisition and improvement of the mortgaged property, with the understanding that the money paid for the bonds is to be used to buy and construct the subject-matter of the mortgage, and that this very useful plan will be entirely defeated, if the mortgagor may, by a device like that here used, create liens on the newly-acquired property prior in right to the original mortgage. Our conclusion would not validate any such proceeding as that supposed in the illustration. There is a clear distinction between the obligations of a mortgagor

under a mortgage in which the property described as mortgaged, though definitely described, is yet to be bought and constructed, and the obligations of one under a mortgage in which the property described as mortgaged is in existence as a completed thing, and the after-acquired property clause is inserted only to increase the original security. In the former class of cases the mortgagor is impliedly bound to buy and complete the thing mortgaged as described, and bring it under the lien of the mortgage, without burden or incumbrance. Such was the case of Wade v. Railroad Co., 149 U. S. 327, 13 Sup. Ct. 892; and such, too, is the case of Venner v. Trust Co. (decided to-day by this court) 90 Fed. 348. In the latter class of cases the mortgagor is bound neither to make additions, nor, if he does make them, to free them from prior liens arising in and out of the act of acquisition. In the case at bar the bridge, as originally projected and contracted for, with approaches and railway connections on both sides of the river, had been completed, and the proceeds of the bonds issued under the first mortgage, and the capital stock had been honestly expended for this purpose. That which was done under the terminal trust deed was an addition to the original plan, not contemplated when the bridge was begun, but made necessary by the demands of the Ohio & Mississippi Railway Company as a condition of its becoming a tenant of the bridge. It was of the greatest benefit to the first mortgage bondholders that what the Ohio & Mississippi Railway Company proposed should be accepted. It secured a revenue from the bridge large enough to insure the prompt payment of the interest on the first mortgage bonds. It is further apparent from the record that, unless an arrangement had been made by which the terminal bonds could be given a first lien on the property to be purchased and improved, the proposed contract with the Ohio & Mississippi Railway Company would have failed, and the payment of interest on the first mortgage would have been rendered very doubtful. We are therefore of opinion that in the case before us all the rights of way which were purchased and paid for by the contract company, together with all the improvements placed thereon by that company, whether the rights of way were first put in the name of Harris, trustee, as the contract required they should be, before transfer to the bridge company, or were conveyed directly to the bridge company, without the interposition of Trabue or Harris, trustee, are subject to a lien in favor of Harris, trustee, for the bondholders, prior to that of the first mortgage. This will include the two lots acquired by condemnation, for which the contract company paid the full purchase price. The payment of the price was a condition precedent to the passing of any title at all, and the contract company, and Harris, trustee, for the bondholders, in thus effecting the purchase, are entitled to rely on the rights secured to them by their contract with the bridge company.

The learned judge who heard this case at the circuit was led to the conclusion that the terminal trust deed did not secure a first lien on the new terminals to the holders of bonds issued under it, because he found that the contract company was nothing but the alter ego of the bridge company, with no real, independent existence, and with no capital or means of carrying out the contract except what the bridge

company furnished it. He held, therefore, that here was presented, not the case of a third person's becoming the purchaser of lands needed by the bridge company, and his bona fide sale to the company, with a vendor's lien reserved for the price, but rather the case of a nominal and subsidiary corporation of the bridge company, acting really as its agent in buying land for it with its own credit, while masquerading as a purchaser and vendor for the purpose of wrongfully evading the lien of the first mortgage on the newly to be acquired terminals. We have examined the record with care, and do not find the facts upon which this conclusion can be supported. The contract company originally built the bridge. There was no reason to suppose that it was not equal to building the terminals. Before the bridge company delivered its bonds to the contract company, the latter had acquired half the land which was to be bought under the contract for the right of way, and had begun the work of improving it. There is nothing to show an identity of ownership in the two companies. The capital of the contract company was comparatively small, but that fact alone does not show the mala fides of the construction contract. Nor does the early delivery of the bonds involve this. It is not unusual for construction companies to look to deliveries of bonds in installments as the work progresses to supply the necessary funds with which to continue construction. The failure of the minutes of the contract company to disclose any directors' meetings for four years only shows that the company was run by its officers, not that it was run by the bridge company. More than this, Harris, trustee, represents bondholders who bought their bonds for value in the open market, and it is stipulated that he had knowledge of no facts conducing to show that the contract company and the bridge company were otherwise than independent corporations contracting in good faith with each other, as shown on the face of the trust deed. Of course, the plan was carefully devised, in order to enable those who should become bondholders to obtain a lien prior to that of the first mortgage. Otherwise, doubtless, the bonds would not have sold for the prices they brought, and the contract company would not have agreed to buy the land and do the work for them. But this purpose does not render what was done in pursuance of the plan fraudulent. Before this is true, it must be shown that the contract and equitable rights of the first mortgage bondholders were in some way infringed by what was done. It must appear that the bridge company was really mortgaging to Harris, trustee, that in which it had a complete legal or equitable title before the mortgage was given and took effect. For the reasons already stated, we do not think the record discloses such a case.

What has been said applies only to the private property bought by the contract company with its money. With respect to the rights of way obtained by ordinances from the city of Louisville and the village of Parkland, the case is different. The contract company paid nothing for these rights of way, and contributed nothing to their acquisition. Therefore they came into the possession and enjoyment of the bridge company burdened with no lien except such as might arise from the improvement of that which was already the property of the bridge company. The right which a city confers upon a railway company to

occupy its streets with its track is an easement; an incorporeal heredita-ment; real estate. Louisville Trust Co. v. City of Cincinnati, 47 U. S. App. 36, 22 C. C. A. 334, 76 Fed. 296. In the case at bar the right was conferred without express condition. The only condition to be implied was a condition subsequent,—that unless the right was exer-cised, and the tracks laid and used in a reasonable time, the grant should be regarded as abandoned, and fail. Upon the passage of the ordinances, therefore, the rights of way vested in the bridge com-pany; and every improvement constructed thereon became attached to the real estate of that company, and subject to the lien of the first mortgage under the after-acquired property clause. The operation of the after-acquired property clause in real-estate mortgages is much affected by the principle, so well established in the common law of real estate, that whatever is attached to land becomes a part of it, and loses its character as personalty. The principle has exceptions. As between landlord and tenant, heir and administrator, and vendor and vendee, custom or contract may enable the one who affixed the articles of personalty to detach them. In the absence of special con-tract, however, as between a mortgagee of realty and one who subse-quently makes a permanent attachment of personalty to the land, the rule is that the lien of the mortgage covering the realty necessarily covers the fixtures, as part of the land, and all liens attaching to the fixtures merely as personalty are displaced by it. This is really based on the doctrine of accession. The personalty has been converted into realty. The only remedy of the owners or lienors of the personalty is personal against the converter, and their remedy against the res is destroyed by its ceasing to be. Hence, all contractors and material men, in the absence of a statute providing otherwise, who stipulate with the owner of realty that they shall have a lien upon the improve-ments on the land created by their work and materials, and on default in payment a right to remove them, only acquire a right in them subor-dinate to the lien of the prior mortgagee of the realty. Railroad Co. v. Cowdrey, 11 Wall. 459; Porter v. Steel Co., 122 U. S. 267, 7 Sup. Ct. 1206; Thompson v. Railroad Co., 132 U. S. 68, 10 Sup. Ct. 29; Wade v. Railroad Co., 149 U. S. 327, 13 Sup. Ct. 892. It follows that the lien given by the after-acquired property clause of the first mortgage attached to the rights of way in the streets immediately upon the passage of the ordinances, and that improvements upon the rights of way only increased the security by becoming part of the realty. The lien asserted by Harris, trustee, on this part of the terminals, did not arise in the act of acquisition, but only in the improvement after acqui-sition. An ingenious argument is made to show that the bridge com-pany obtained no title to the rights of way in the streets until the tracks were laid and the railroad was completed, and that by analogy to the case of Irrigation Co. v. Garland, 164 U. S. 1, 17 Sup. Ct. 7, the lien for the improvement accompanied the right of way into the possession and enjoyment of the company, because the improvement was necessary to the acquisition, and inhered in the title, which was ripened by it. The argument fails, because, as already stated and decided in this court, it was the ordinance which passed the title, and not the laying of the tracks by its authority.

It remains to consider those cases in which the land for rights of way was given for a nominal consideration to the bridge company. It is impossible to distinguish them from the rights of way granted by ordinance. The title to the land passed to the bridge company, and the improvements constructed thereon became a part of the realty of that company, to which the lien of the first mortgage attached the moment the title to the land passed to the company. The lien of Harris, trustee, upon such lands, must therefore be postponed to that of the first mortgage.

The result is that the lien of the terminal trust bondholders upon the new terminals is, as to that part situate upon real estate or rights of way for which the contract company paid, prior in right to the lien of the first mortgage, to the extent of the sums expended in buying the lands or easements, and in erecting the necessary structures thereon, but that as to the remainder of the new terminals their lien is junior to that of the first mortgage. The new terminals, however, cannot now be divided up into their component parts; and these two liens upon the separate portions must, in view of the unit character of the subject-matter of the liens, be transferred to an undivided portion of the whole. Unless the parties can agree upon the proportionate value of the two parts of the new terminals distinguished as above, then the case must be referred to a master for decision of the question. If, then, for illustration, the master were to report that the terminals were worth $300,000, of which the part bought by the contract company was worth $100,000, and it had expended in its purchase and improvement $100,000, then the result would be that the terminal trust bondholders would have a lien to the extent of $100,000 on an undivided one-third of the new terminals, and the first mortgage bondholders would have a lien on the remainder to secure their entire claim.

2. The lien of the Columbia Finance & Trust Company arose under a contract between that company and the bridge company, by which the trust company agreed to purchase the necessary right of way for the purpose of erecting a new approach to the bridge to take the place of the old wooden approach. The contract stipulated that the title to the property for the approaches was to be taken in the name of the trust company, and was to be conveyed to the bridge company when that company paid to the trust company the money expended in its purchase, together with a reasonable compensation for the transaction. It was further provided that, in case there were consequential damages to other property by the use of the property bought for bridge purposes, such damages, to the extent of $3,500, were to be paid by the trust company, and reimbursed to it. The money advanced by the trust company to buy these lots has never been paid by the bridge company. The title to the lots was taken in the name of the trust company. The only title, therefore, which the bridge company has in the property is the title which is subject to the payment of the purchase price, which the Columbia Finance & Trust Company, as the holder of the lots, is entitled to. This property was bought, not with the money of the bridge company, but with the cash of the trust company. The consequential damages were a part of the cost of the

property bought for the use of a bridge. Therefore they are a part of the purchase price which the bridge company owes to the trust company for the same lots. The same is true with reference to compensation for services due the trust company, and so-called "interest." The bridge company never acquired any interest or title in the land, except as it was subject to these vendors' liens, for they are strictly such.

3. We now come to the intervening petition of J. W. Gaulbert and others, based upon two notes of the bridge company (one for $8,000, and the other for $1,000), upon which the petitioners became indorsers at the request of the bridge company, and which they have been obliged to pay. They claim a lien upon the property held in trust by the Columbia Trust Company junior to the lien of that company, but prior in right to the lien of the first mortgage. Their case rests on the following provision of the trust agreement between the bridge company and the Columbia Trust Company:

"After the said trust company shall have been fully repaid the advances to be made by it for the purchase of ground as above mentioned, the said property conveyed to it as aforesaid, and the said railroad to be constructed thereon, shall be held by said trust company in trust to secure the payment of such moneys as may be advanced by any other persons to or for the account of the bridge company to enable it to pay for the labor and material to be used in the construction thereof. The amounts of said advances by other persons, with the names of the parties making the advancements, and who shall become thereby entitled to the benefit of the security of this trust deed, shall be furnished from time to time by the bridge company to the trust company; it being understood that the term 'advances' shall embrace, not only money loaned by individuals to the bridge company, but moneys raised upon notes or other obligations upon which individuals may have become bound for the bridge company, as indorsers, guarantors, accommodation makers, or otherwise; and, subject to the right of the trust company to its prior lien, it shall, when called upon, take all proper steps to subject the trust property herein above mentioned to the payment of said advances; but the time within which the advances to be made by the trust company shall fall due under this agreement shall not be prejudiced by any arrangement with such other persons."

It is by no means clear that the money raised upon the two notes here in question was kept as a trust fund to build the structure. It seems to have been turned into the general account of the bridge company, and all that the president of the bridge company can say is that an amount equal to the sum so raised was at some time expended by the bridge company in the erection of the new part of the bridge. In our view of the case, it is not very material how the money was expended, for on no possible hypothesis can the lien to secure the indebtedness supplant that of the first mortgage. The after-acquired property clause in a mortgage does not displace any equitable lien which really grows out of the act of acquisition, by purchase or otherwise, so that the mortgagor may be properly said to acquire the property with the lien on it, or less the lien. It is not infrequently a nice question to decide whether the lien really inheres in the act of acquisition, or whether it is given the false appearance of doing so at the instance of the purchaser, for the purpose of evading an after-acquired property clause in a prior mortgage, and is really nothing more than a lien taking effect after the act of acquisition, and not as part of it, and is thus subordinate to the mortgage. In the case of

McGourkey v. Railway Co., 146 U. S. 536, 13 Sup. Ct. 170, the issue was between the mortgagee under an after-acquired property clause and the lessors of certain equipment, as to priority of liens. The court found that though the leases, in form, purported to convey the equipment to the railroad company, reserving a lien, the fact was that the company had actually bought them with its own funds, and that subsequently a lease was executed covering them to secure funds advanced to the company by the directors for other purposes, and that the leases were only evidences of a lien attaching to the equipment after it had been purchased by the railroad company, and that it was therefore subordinate to the lien of the prior general mortgage, with an after-acquired property clause. In like manner, we must hold the arrangement now under discussion ineffective to displace the lien of the first mortgage. The creditors sought to be secured were the creditors of the bridge company.. They loaned their credit to the bridge company to enable it to borrow money to build its own bridge. The bridge company secured to them a lien on its equitable interest in the land bought for it by the Columbia Trust Company, after it should have paid the purchase price to the trust company. To that equitable interest the lien of the first mortgage attaches the moment the purchase money is paid. As the learned judge of the circuit well said, "The interest which was thus made subject to these advances was the interest of the bridge company, and not the title or interest of the trust company." The lien of Gaulbert and others upon the new approach is therefore subordinate to the lien of the first mortgage.

4. The lien of the Youngstown Bridge Company grows out of the mechanic's lien law of 1888. That provides that any one complying with the provisions of the statute shall have a lien on the property and franchises of the owner and owners thereof for the full contract price of said labor and material, etc. The Youngstown Bridge Company erected the bridge on land which was held by the Columbia Finance & Trust Company. The contract by the Youngstown Bridge Company was with the Kentucky & Indiana Bridge Company. We concur in the view of the court below that, as the lien can only arise against the property of the owner, the contract made by the Kentucky & Indiana Bridge Company did not confer a lien upon the interest that the trust company had in the property upon which the bridge was built, and therefore that the lien must be subordinate to the rights of the Columbia Finance & Trust Company in the main line of the bridge. As between the Youngstown Bridge Company and J. W. Gaulbert and others, however, the result must be different. Gaulbert's only lien is on the equitable interest of the bridge company, and to that the mechanic's lien also attaches. The statute which gives the mechanic's lien provides that the lien upon the structure shall be prior in right to mortgages theretofore and thereafter created upon the land. This, of course, applies to prior or subsequent liens as well. As a consequence, the mechanic's lien of the Youngstown Bridge Company must be prior in right to that of J. W. Gaulbert upon the equitable interest of the bridge company in the property conveyed to and held by the Columbia Finance & Trust Company.

5. The claim of the Central Thomson-Houston Company for a me-

chanic's lien cannot be sustained. The work done was on both sides of the river, in Kentucky and in Indiana, on the bridge, on the street railway of the New Albany Street-Railway Company, and on the Short-Route Transfer Company tracks. The contract provided for the payment of the lump sum of $32,000, which was afterwards reduced to $27,000. The statutes relied on had no extraterritorial effect, and, if the parties intended to secure a lien under the Kentucky statute, it would have been natural for them to fix in the contract the cost of the work done in Kentucky. The notes for the lump price were given with the agreement for renewals, and two of them did not fall due in the time within which a suit must have been brought under the mechanic's lien statute. Provision was made in the contract for the deposit of bonds of the Albany Street-Railway Company, to secure the notes, and the bonds were deposited. We concur with the circuit court in its construction of the contract, and its view that the terms of the contract were inconsistent with the intention on the part of either party that a lien should exist, and therefore that any claim for a lien was impliedly waived by the contract. For a fuller discussion of this point we refer to the able and satisfactory opinion of the learned judge who heard the case at the circuit.

6. The only question remaining is as to the mode of sale. Shall the bridge be sold as a whole? Or shall the bridge and the main line be sold as a parcel, and the new terminals be sold as a parcel, and then the whole be offered as an entirety? The circuit court ordered the bridge and all the terminals sold as an entirety. We shall not discuss the wisdom of that order, because it was based on a conclusion as to the rights of the parties in the new terminals different from that which we have reached. Harris, trustee under the terminal trust deed, and Dowling and Stotsonberg, trustees under the first mortgage deed, are, so to say, tenants in common of the terminals covered by the terminal trust deed, in proportions to be fixed by a reference. It is of much importance, therefore, that the value of the new terminals should be established by a sale. This may be done by offering the terminals separately, the bridge and main line separately, and then the bridge and all the terminals as an entirety. If the bids for the parcels are less than the bid for the whole, then the latter bid shall be accepted. If greater, then the separate bids shall be accepted. In either case the separate bids fix the relative value of the parcels. The statute under which the terminals were erected provided that they might be mortgaged separately. This, of course, implied the power and duty of the court, in a proper case, to order them sold separately. The second mortgage bondholders who have a lien on the bridge and terminals as an entirety, pray for a sale of the parcels, and then a sale of the whole. Only the Youngstown Bridge Company, with a lien for $20,000, asks a sale of the whole without a sale by parcels. This lien is subordinate to the lien of Harris, trustee, on the new terminals, and subordinate to that of the Columbia Trust Company on the bridge and main line. The voice of its owner ought not to be given great weight, therefore, in influencing the discretion of the court to depart from the ordinary course pursued in the sale of a unit property, parts of which are covered by divisional mortgages. The sale

of the parcels and the sale of the whole seem to give all parties a better opportunity to protect themselves against a sacrifice sale. The sale decreed by the circuit court was a sale subject to the lien of the first mortgage. It is not necessary to change this, except to declare that the prior lien of the first mortgage covers only an undivided part of the new terminals, and the purchaser will take the same subject to such a lien. The junior lien, which the first mortgage trustees will have on the remainder of the new terminal, will simply give to them a right to redeem that remainder from the purchaser. The decree of the circuit court is in part affirmed, and in part reversed, and is remanded to the circuit court for further proceedings not inconsistent with this opinion.