[No. 11522. Department Two. April 1, 1914.]

## JOHN H. LUNDBERG, *Appellant*, v. KITSAP COUNTY BANK, *Respondent*.[1]

SALES—CONDITIONAL SALES—CONTRACTS — CONSTRUCTION. An instrument acknowledging receipt of the first payment on mill property and reciting the amount of the full purchase price, and providing for a change of possession and time for payment of installments evidenced by promissory notes, without specifying when the title was to pass, implies a reservation of the title until the notes are paid in full, and must be held to be intended as a conditional sales contract, where it further provided for forfeiture of all payments made in case of failure to pay the installments when due, and also for forfeiture of a dry kiln, if built by the purchasers, who agreed to keep the mill insured until the full price was paid; and all of the parties, except one of the grantees, seemed to have construed it as a conditional sales contract.

SAME—RESERVATION OF TITLE. The reservation of title essential to a conditional sales contract may be implied from the terms of the contract.

Appeal from a judgment of the superior court for Kitsap county, French, J., entered March 8, 1913, upon findings in favor of the defendant, in an action for conversion. Affirmed.

*Fred C. Campbell* and *Carl J. Smith*, for appellant.

*John E. Ryan* and *Grover E. Desmond*, for respondent.

MORRIS, J.—The nature of this action can best be determined from a recital of the facts necessary for a proper understanding of the questions submitted by the appeal. On November 10, 1908, Julian Cordz was the owner of a small

[1]Reported in 139 Pac. 769.

sawmill plant, near Colby, in Kitsap county, and on that day entered into a written agreement for its sale to appellant Lundberg and H. U. Johnson. Whether this was an absolute sale, as contended by appellant, or a conditional sale, as contended by respondent, is one of the disputed questions in the case. On February 16, 1910, the interest obtained by Lundberg and Johnson under this contract was sold to the Kitsap Mill Company. The nature of the contract under which this last transfer was made is not disclosed in the record. It simply appears that such a sale was made. It is evident that Johnson was not a party to this last transfer, as the consideration seems to have been $1,000, which was represented by a note and chattel mortgage on the plant, given to Lundberg by the mill company of which Lundberg was then president. What became of Johnson's interest, does not appear. The only reference to it in the record is a question asked Lundberg, while he was on the stand, if he had purchased Johnson's interest, to which he answered, no.

On May 19, 1910, the mill company gave the bank a note for $2,000, secured by a chattel mortgage on the mill property, together with other property not covered by the Cordz contract nor by the prior mortgage to Lundberg. On August 16, 1910, Cordz transferred his interest in the contract of November 10, 1908, to the bank. On September 23, 1910, Lundberg commenced a statutory foreclosure of his mortgage, by placing a notice of sale in the hands of the sheriff. On October 1, 1910, the bank started a like foreclosure of its mortgage. The date of sale under these foreclosure mortgages was fixed for October 14.

The mill company, however, on October 4, commenced an action removing the foreclosure proceedings of both mortgages to the superior court, and obtained an order from the court enjoining the sale under the two mortgages, securing also an order for the redelivery of the property to it pending the determination of the action. Both the bank and Lundberg were made defendants to this action, and each an-

swered, setting up the chattel mortgages and asking for priority.

During the pendency of this last action and before any hearing had been had, the bank, claiming title to the property under its assignment from Cordz of the original contract, sued out a writ of replevin against the mill company, and on November 18, 1910, the court rendered its decree in this action, holding that the Cordz contract was a conditional sale, that default had been made in the payment due thereunder, that the mill company obtained no title to the property through its purchase from Lundberg, and that the bank was the absolute owner of the property and entitled to its possession. Under this decreee, the bank took possession of the property, dismantled the plant, and stored the machinery.

The injunction suit brought by the mill company reached a final determination on December 6, 1910, when the court entered a decree foreclosing the chattel mortgages, giving priority to Lundberg's. The record discloses nothing further on the part of either party until July 8, 1911, when Lundberg, through his counsel, wrote a letter to the bank, in which he stated:

"While making no concessions as to your title thereto or lien thereon, yet in order to avoid litigation between you and Lundberg, I, on behalf of Lundberg, am ready and willing to pay you the balance unpaid on the original purchase price as evidenced by the contract of sale, provided you will deliver up possession of the property covered by Lundberg's mortgage and decree for the purpose of sale pursuant to said decree. If you are willing to accept the amount due on said contract of sale and interest and any legitimate expense which you may have incurred in connection therewith and deliver the possession of said property as aforesaid, please notify me of the amount due, and I will pay the same for and on behalf of Lundberg."

The bank, on July 11, answered this letter, declining the proposition, and asserting an absolute title to all the property. On October 13, 1911, Lundberg commenced this action

against the bank, in which he sought to obtain a judgment against the bank for the amount due under his note and mortgage, upon the theory that the possession of the bank was a conversion of the property as against him. The lower court found against this contention, holding that the Cordz contract was a conditional sale, that title to the property passed to the bank by its assignment of the Cordz contract, that default had been made in the terms of purchase, and that the bank was rightfully in possession of the property. Upon these findings, the action was dismissed and Lundberg appealed.

The first question to be determined, and the crucial one in the case, is the nature of the Cordz contract, as to whether or not it is a conditional sale. This contract, in so far as it is material to the question involved, is as follows:

"Port Orchard, Washington, November 10, 1908.
"Received from H. U. Johnson and John H. Lundberg the sum of $700 as first payment on [describing the property;] possession of the mill and all pertaining thereto to be given on the 11th day of November, 1908. The full purchase price of the above Kitsap Lumber Company mill and the appurtenances thereto is $4,035, of which $700 has this day been paid. Balance to be paid as follows: [setting forth the deferred payments evidenced by seven promissory notes, the last of which became payable on the first day of June, 1910;] and in case of failure of the said Johnson and Lundberg to make any of the above payments they shall forfeit all payments already made by them, and if a dry kiln is built it also shall be forfeited to me. Johnson and Lundberg to keep the said mill insured in the sum of $2,000 until the full purchase price has been paid. The said Johnson and Lundberg shall also keep fifty thousand feet of lumber in the yard at all times or as near as possible to that amount."

This instrument contains no words of bargain or sale. It makes no reference to title or ownership. It provides for a change of possession of the property and the terms upon which payments are to be made. It is evident that the parties intended title to pass some time; and that time not being expressed, we must apply the rules established by the

law for construing contracts of this character, and one of them is that, in contracts of sale, the test as to whether the title passes immediately to the buyer is the intention of the parties. *Day v. Gravel,* 72 Minn. 159, 75 N. W. 1; *Harkness v. Russell,* 118 U. S. 663; *Whitwell v. Vincent,* 4 Pick. 449, 16 Am. Dec. 355; *Hammett v. Linneman,* 48 N. Y. 399.

That Cordz regarded it as a conditional sale contract is evidenced by his assignment of it as such to the bank. We find no expression in the record from Lundberg, either by word or act. It does not appear in what manner he passed any interest he had, or assumed to have, to the mill company. All we know is that, as president of the mill company, with its secretary, he executed the note and chattel mortgage from the mill company to himself for $1,000. The mill company, in its answer in the replevin suit, sets forth that it holds the property under a conditional sale contract. The auditor's certificate refers to the instrument as a conditional sale contract, filed at the request of Johnson, who acted with Lundberg in the original purchase. Whether it was thus designated by Johnson, or the auditor construed it to be such, we do not know. The findings and decree in the replevin suit referred to it as a conditional sale contract. So that every person who has had any relation to the instrument, except Lundberg, has treated it as a conditional sale contract. Lundberg was not a party to the replevin suit and is, of course, not bound by the recitals of that decree. This contract was evidently inaptly drawn to express the real intent of the parties. But contracts of conditional sale do not have to be expressed in any set form or language. They may take such form as the parties choose to give them; and they will be read, not upon the form of the instrument alone when that form is deficient, but upon the intention of the parties as gathered from the language of the contract. *Parke & Lacy Co. v. White River Lum. Co.,* 101 Cal. 37, 35

Pac. 442; *McDaniel v. Chiaramonte*, 61 Ore. 403, 122 Pac. 33; *Hamilton v. Highlands*, 144 N. C. 279, 56 S. E. 929; *Heryford v. Davis*, 102 U. S. 235; 35 Cyc. 654; Tiedeman, Sales, § 201.

The provision for forfeiture of all payments made, in case of failure to make the different payments when due, can have no meaning at all except it was the intention of the parties that, in case of such, failure, the seller would be entitled to the possession of the property. If title passed with delivery of possession, it is clear there would be no place in the contract for a forfeiture clause. A forfeiture clause is sometimes used to indicate the reservation of the title by the seller, and sometimes to indicate the reservation of the right to retake possession, as where the present title passes subject to be divested by some failure to act on the part of the vendee, as upon nonpayment. It seems to us this forfeiture clause must have been intended either for one or the other of these reservations; which, is immaterial; since under either the seller's right to retake the property would be the same. We cannot read this clause without reaching the conclusion that, by employing it, the parties intended it as evidencing an agreement that, until full payment of the notes, no absolute title in the property would pass to the buyers.

This intent is again made clear, it seems to us, by the reference to the dry kiln, "it also shall be forfeited to me." The vendees not only forfeit all interest in the property purchased, but the dry kiln also is to pass to the vendor in case of the failure to make any of the deferred payments. This provision of the contract is clear and conveys its own meaning. If the vendees do not make the deferred payments, any dry kiln built upon the property becomes the property of the vendor. There would be no sense in this stipulation unless it was the intention of the parties that all the property described in the contract should become the property of the vendee in case of any default. Why should the vendees surrender the dry kiln to the vendor if they are to retain the rest

of the property? The plain intention is that the dry kiln and the rest of the property are to be classed together and all surrendered to the vendor, if the conditions of payment are not complied with. The provision for insurance also indicates that the vendees were not to obtain an absolute right to the property until the full purchase price had been paid. While it is a distinguishing feature of conditional sale contracts that the title to the property remains in the seller until payment of the purchase price, it is also held that this reservation of title may be implied. *McManus v. Walters,* 62 Kan. 128, 61 Pac. 686. To our mind, this instrument clearly implies a reservation of the title, and it cannot be read without concluding that such was the intention of the parties.

Appellant suggests that there is nothing in the record to show any default establishing a right in the seller to retake the property. Referring to his letter of July 8, 1911, we find an effort on his part to pay the bank "the balance unpaid on the original purchase price as evidenced by the contract of sale;" and one of the findings proposed by him, refusal to sign which he now alleges as error, is that at the time the bank "took possession of the property, there was due and unpaid on the original purchase price under said contract of sale the sum of approximately $750."

Holding that the original contract should be construed as a conditional sale contract, and that a default had been made in the payments, justifying the bank as the assignee of Cordz to retake the property, it is unnecessary to go further into the case, as it follows that the mill company never had any title to the property to support its chattel mortgage to Lundberg, and no right when the property passed to him by virtue of the mortgage which would be superior to the rights of the bank.

The judgment is affirmed.

Crow, C. J., Mount, Parker, and Fullerton, JJ., concur.