[No. 20760.   *En Banc.*   February 10, 1928.]

BANK OF CALIFORNIA, *Respondent*, v. CLEAR LAKE LUM-
BER COMPANY *et al., Appellants.*[1]

[1] VENDOR AND PURCHASER (31)—EXECUTORY CONTRACT—TITLE OF
VENDEE. An executory contract to sell land with a conditional
license to cut and remove the timber, conveys no title to the
land.

[2] LOGS AND LOGGING (1)—VENDOR AND PURCHASER (45)—SALE OF
STANDING TIMBER—RIGHT TO REMOVE—RESCISSION BY VENDOR.
An executory contract to convey land with a conditional license
to cut and remove the timber, and fixing a time within which
the timber may be removed, may be terminated on account of
default, and the right to enter and remove timber, standing
or cut, is thereby terminated.

[3] LANDLORD AND TENANT (32)—SALES (169)—LEASE—OPTION TO
PURCHASE—CONDITIONAL SALES DISTINGUISHED FROM LEASE. A
contract is but a lease with an option to purchase, and not a
conditional sales contract, where the only provision as to a
purchase was a clause that at any time prior to its termination
the lessee shall have the right, on notice, "to purchase the
whole of said rails and fastenings" at a specified price, and
"upon such purchase this lease shall immediately cease and
determine."

[4] SALES (182)—CONDITIONAL SALES—REMEDIES OF SELLER—ELEC-
TION—WAIVER. An election to reclaim property sold on a con-
ditional sales contract is a waiver of the right to recover any
part of the unpaid purchase price, whether the same be de-
nominated "interest" or "rental."

[5] SAME (182)—CONDITIONAL SALES—REMEDIES OF SELLER—COST OF
REDELIVERY. Where a conditional sales contract provided that,
if it becomes necessary to retake the property, it shall be de-
livered to the vendor at a certain place, on breach of the con-
tract the rights of the parties become fixed, and the vendor is
entitled to judgment for the cost of delivery of the property
to the place agreed upon.

[6] COMMERCE (2)—RAILROADS (1)—REGULATION—RULES OF INTER-
STATE COMMERCE—APPLICATION TO LOGGING RAILROAD. The inter-
state commerce act of 1920, U. S. Comp. Stat., 1923 Supp.,
§ 8563, providing generally under what conditions railroads may

[1]Reported in 264 Pac. 705.

build extensions, issue stock, bonds or evidences of indebtedness or assume obligations, has no application to a logging road used solely by a mill company owning all its capital stock, notwithstanding the interstate commerce commission had assumed jurisdiction over it.

[7] CORPORATIONS (223)—RECEIVERS (36)—EFFECT OF APPOINTMENT ON RIGHTS OF CREDITORS—TITLE OF RECEIVER. The receivers of a lumber company have no greater rights as representatives of the insolvent than the insolvent had, and are estopped to assert claims against creditors and incumbrancers which the insolvent would have been estopped to assert.

[8] CORPORATIONS (212)—INSOLVENCY AND RECEIVERS—REMEDIES OF CREDITORS. Where an insolvent lumber company had, after the execution of mortgages, expended money on a railroad which would have been available to its creditors if it had not been so expended, the receivers of the insolvent should be allowed to recover from the railroad company the amount of the items to which the company had no defense.

[9] CHATTEL MORTGAGES (35)—CONSTRUCTION—AFTER-ACQUIRED PROPERTY. A mortgage of a vast industrial plant, engaged in large operations requiring replacements, repairs, improvements and extensions, covers after-acquired property which became an integral part of the original plant, under a clause describing the equipment "now being or that may hereafter be built or placed on or connected with the real property . . . or now or hereafter used in connection with" its business and "all extensions and additions thereto. . . ."

[10] RECEIVERS (95)—ACCOUNTING—LIABILITY OF PARTIES OR PROPERTY FOR COMPENSATION AND EXPENSES. Upon the appointment of a receiver of mortgaged property at the instance of others than the mortgagee, it is proper to allow against the mortgagee part of the receiver's expenses where the mortgaged and other property was so commingled that it became necessary to conserve and care for all of it together, and the amount allowed as a prior lien was for expense that inured to the benefit of the mortgagee.

[11] JUDGMENT (219)—RES JUDICATA—IDENTICAL ISSUES. A judgment of reformation of a mortgage, excepting certain specified property of a mill company, not appealed from, is res adjudicata and binding in subsequent litigation between the same parties and the receiver of such mill company, upon a claim of the mortgagee to reform the mortgage by including the property excepted by the former decree.

[12] EXECUTION (40)—SALE EN MASSE OR IN PARCELS. A decree providing for the sale of an industrial plant comprising both

real and personal property, fails to preserve the equity of redemption and is erroneous, where it provides for a sale either in separate parcels or in bulk; in view of the provisions of Rem. Comp. Stat., § 583 to 587, providing how sales of real estate shall be conducted, and other statutes covering the sale of personalty.

Cross-appeals from a judgment of the superior court for Skagit county, Joiner, J., entered March 25, 1927, upon findings determining priorities of claimants, in an action to foreclose a mortgage. Reversed.

*Geo. T. Reid, C. H. Winders,* and *L. B. da Ponte,* for appellant Northern Pacific R. Co.

*Bogle, Bogle & Gates, Cassius E. Gates, Thomas Smith,* and *Edward G. Dobrin,* for appellants, Receivers of Clear Lake Lumber Co.

*Peters & Powell, Robert H. Evans,* and *Kerr, McCord & Ivey,* for respondent Bank of California.

*Charles S. Albert* and *Edwin C. Matthias,* for respondent and appellant Great Northern R. Co.

*Wright, Froude, Allen & Hilen,* for respondent Puget Sound & Cascade R. Co.

FRENCH, J.—This case arose out of various conflicting interests involved in the affairs of the Clear Lake Lumber Company. In the summer of 1925, and at the instigation of a stockholder, receivers were appointed to manage its affairs, and later, in the early part of 1926, certain creditors, by independent suit, joining in the application, the former receivers were discharged and the present ones appointed. For a number of years prior to this time, the Clear Lake Lumber Company owned and operated a large mill at Clear Lake in Skagit county, had vast holdings of timber, considerable quantities of logged-off lands, contracts with the Great Northern Railway Company

covering valuable and extensive bodies of timber with the right to log the land, and the conditional right to purchase the same.

It also owned all of the stock of the Puget Sound & Cascade Railroad Company, a corporation, which it had caused to be organized and which had constructed a railroad from Mount Vernon, where it connected with the Great Northern, to the mill at Clear Lake, and thence east to Phinney creek, a total length of approximately twenty-seven miles. This railroad was organized as, and became, a common carrier of freight and passengers, but was built from time to time by the lumber company as its necessities required, and practically the entire business of the railroad was hauling logs from the timber lands of the mill company to its mill at Clear Lake, or the finished product from the mill to Mount Vernon, there to be switched to the Great Northern for distribution to points all over the United States. The various designated stations on the line of the railroad east of Mount Vernon were but white circles on a blue print, the exact physical locations being determined from time to time as the logging operations of the mill company seemed to require. The general plan of constructing the railroad seems to have been that the mill company would build such portion of the railroad as was needed for the purpose of taking logs out, and thereafter the railroad company would issue stock to the mill company for the money expended in constructing the additional road.

In January, 1924, the Clear Lake Lumber Company executed a mortgage to the Bank of California, as trustee, to secure a large bond issue. Some $800,000 of the bonds were sold, about $100,000 of which were afterwards retired, leaving a balance of some $699,000, with certain accrued interest thereon. This mortgage covered generally all of the land and personal prop-

erty of the lumber company, and was executed, recorded and filed both as a real estate mortgage and as a chattel mortgage. There was also pledged with the bank as security all of the capital stock of the Puget Sound & Cascade Railroad Company. At the time of the execution of this mortgage and the pledging of the stock, some further portion of the railroad was in course of construction, the cost of which was carried on the books of the company as a capital asset. This particular portion of the railroad was commenced in 1921, and continued until 1924, or the early part of 1925, and completed the road to Phinney creek, where there was a body of timber, estimated at from two billion to three billion feet, directly tributary.

The inference is clear that it was the intention of both the directors of the railroad company and of the mill company to handle this matter as all other extensions or additions to the railroad had been handled, namely, that when the work was completed there would be issued to the mill company stock of the railroad company for all moneys expended, and some preliminary steps had been taken to permit this to be done. On application, the Interstate Commerce Commission assumed jurisdiction over the railroad, and joint rates were established by order of the commission, dated February 14, 1922. The railroad published regular tariffs for both freight and express, although the evidence seems to indicate that all of the business of the railroad not supplied by the mill company could have been taken care of on a handcar.

In the building of the railroad certain equipment consisting mostly of steel rails had been obtained from the Great Northern Railway Company and from the Northern Pacific Railway Company, and both of the last named railway companies had, by appropriate proceedings, made claim for the return of the rails or for

money claimed to be due, or for both.   The Bank of
California, trustee, had asked to have its mortgage
foreclosed, and had asked also to have the mortgage
reformed in certain particulars, which will be here-
after noticed.  The receivers are claiming certain com-
pensation for the care, preservation and management
of the property.   Certain preliminary orders had been
made in the receivership proceedings, and when the
matter finally came on for trial with all of these vari-
ous interests represented, with the large amount of
both secured and unsecured claims, the inquiry took
a wide latitude, covered a considerable space of time,
and necessarily presents a voluminous record.

Under the contract dated January 1, 1923, the Great
Northern Railway Company agreed to sell certain
lands to the lumber company, the pertinent provisions
of the contract being as follows:

"(1)   The railway company, for and in considera-
tion of the payment of moneys hereinafter stipulated to
be paid, and of the faithful observance and perform-
ance of all the covenants and promises hereinafter con-
tained, made and to be observed and performed by the
lumber company, has agreed, and does hereby agree
to sell and convey to said lumber company, by good
and sufficient deed of conveyance, subject, however,
to the reservations and exceptions hereinafter set forth,
all those certain pieces, parcels or tracts of land situ-
ated and being in Skagit County, State of Washington,
described as follows, to-wit:

[Here follows description of the real estate]

"Excepting and reserving unto the railway com-
pany, its successors and assigns, all iron ore, coal and
other minerals upon or in the lands hereby agreed to
be conveyed, together with the right to explore for,
mine and remove the same at any time, provided such
iron ore, coal or other mineral shall not be explored
for, mined or removed in such a manner as to injure
the logging railway of said lumber company or in-

terfere with the cutting, milling or removal of timber, standing and down upon said lands; provided also, that any timber which may be cut from said lands by the railway company for purposes of exploring for, mining or removing any such iron ore, coal or other minerals shall be and remain the property of the Lumber Company, or shall be paid for by the Railway Company at a reasonable market value per thousand feet, board measure; it being understood that in the event of such cutting, exploration for, mining or removal of such iron ore, coal and other minerals by the Railway Company, it shall become necessary to move or relocate any part of the railway tracks of the said Lumber Company, located on said described lands, such removal may be made by said Railway Company, but at its sole cost and expense and without unreasonable interference with the operation and use of said railway tracks by said Lumber Company.

"(2)   Said Lumber Company has agreed, and hereby does agree, to purchase said lands above described, and to pay to said Railway Company therefor the sum of Six Hundred and Fifty Thousand Dollars ($650,000), with interest at the rate of six per cent (6%) per annum until paid, payment thereof to be made to the Railway Company at its general office in Saint Paul, Minnesota, or at such other place as it may from time to time designate in writing, on the dates and in the amounts of principal and interest following,

| Principal | Interest | Total | Date Due |
|---|---|---|---|
| $81,250 | $39,000 | $120,250 | January 1, 1924 |
| $81,250 | $34,125 | $115,375 | January 1, 1925 |
| $81,250 | $29,250 | $110,500 | January 1, 1926 |
| $81,250 | $24,375 | $105,625 | January 1, 1927 |
| $81,250 | $19,500 | $100,750 | January 1, 1928 |
| $81,250 | $14,625 | $95,875 | January 1, 1929 |
| $81,250 | $9,750 | $91,000 | January 1, 1930 |
| $81,250 | $4,875 | $86,125 | January 1, 1931 |

.    .    .    .    .    .    .    .

"(6)   In the event the Lumber Company shall desire to cut and remove any timber from the lands above described before the due date of such first payment maturing January 1, 1924, it shall notify the Railway

Company in writing of its intention so to do, and shall pay to the Railway Company said first installment of principal next due and payable as aforesaid; provided that if such payment shall be made before the aforesaid due date thereof, the interest thereon shall be computed and paid to the date of such advance payment only, it being understood that nothing herein shall release said Lumber Company from the payment on January 1, 1924, of the interest which shall then have accrued upon the remainder of said principal sum. On receipt of such notice and payment from the Lumber Company the Railway Company will permit the Lumber Company to enter upon the lands above described and occupy the same during the continuance of this agreement for the purpose of cutting and removing timber therefrom, to the extent and in manner and form hereinafter provided.

"(7)    The Lumber Company, except as hereinafter provided, shall not cut or log in any one year more than twelve and one-half per cent (12½) of the timber now standing and down upon the lands above described, except that in the event it shall desire to cut more than said twelve and one-half per cent (12½) of said timber in any one year, it shall pay to the Railway Company, in advance, such proportion of that installment of the purchase price next to become due and payable as the excess amount of timber so desired to be logged or cut shall bear to the twelve and one-half (12½) per cent of the standing and down timber in said described lands, which may be logged or cut under the terms hereof in any one year; Provided, however, that the railway company shall have the right to apply such advance payment on account of excess timber cut. or logged upon the last installment of principal and interest to become due and payable under the terms hereof.

"(8)    The Lumber Company, at its election, may pay the whole of the purchase price of said lands, with interest which may have accrued thereon, at any time before the same shall become due and payable; and the Railway Company will then convey said lands to

said Lumber Company, subject to all reservations and exceptions herein provided.

"(9)    The Lumber Company shall conduct its logging operations on said described lands in the usual and customary way and in a workmanlike manner, and in all things by it done in connection therewith, shall comply with all the laws of the State of Washington and the rules and regulations of any duly constituted authority governing the cutting, logging, milling and removing of timber standing and down upon the lands in the State of Washington, and the burning of cuttings, tops and slashings and other refuse remaining from logging operations; and the Lumber Company, during all such times as weather conditions render the same necessary, shall employ a sufficient number of patrolmen to fully protect said timber from fire and to extinguish any fires which may endanger the same whether originating on the lands above described or on adjacent lands.

"(10)    The Lumber Company shall indemnify and save harmless the Railway Company from any and all damages, claims, suits, costs and recoveries of every name or nature which may in any manner arise from or grow out of the logging operations of the Lumber Company or the failure of the Lumber Company to observe and perform each and every of the covenants and promises herein contained, by it to be observed and performed; and the Lumber Company, in consideration of the agreement to convey said described premises to it, under the terms and conditions herein set forth, for itself, its successors and assigns, does hereby assume all risk of damage to, or loss or destruction of, structures, or their contents, or other property bought by the lumber company, or by other persons at its instance, or with its consent or knowledge, upon, or in proximity to, said described lands, which may be caused by fire due directly, or indirectly, to negligence upon the part of the Railway Company, its contractors, officers, agents, employees, or otherwise; and the Lumber Company shall and hereby does, indemnify and save harmless the Railway Company for and from any and all claims, demands, suits, recoveries, judgments,

costs or expenses on account of such damage, loss or destruction. Provided, however, that the Railway Company shall pay to the Lumber Company or shall deduct from the next maturing purchase payment to be made by the Lumber Company under the terms hereof, at the rate of two dollars and fifty cents ($2.50) per thousand feet, board measure, for any and all merchantable timber standing and down on said lands which, during the life of this agreement may be destroyed by fire due to or caused by the sole negligence of the Railway Company; and for the purpose of ascertaining the quantity of any merchantable timber so destroyed reference shall be had to the cruise of the timber standing and down on said lands made by the Railway Company and now in its possession, and the count as established thereby shall be conclusive and binding upon each of the parties hereto; and provided further, that nothing herein contained shall release, or be construed to release, the Lumber Company from the obligation to make any and all of the purchase payments by it to be made, as herein provided, or from any liability by it herein and hereby assumed. . . .

"(15)   In the event the Lumber Company shall fail to make each and every of the payments herein provided, promptly as and when the same shall become due and payable, or shall fail to observe and perform each and every of the covenants and promises by it to be observed and performed, as the same are herein set forth, then the Railway Company, at its option, may terminate this agreement and all the rights of the Lumber Company hereunder shall thereupon immediately cease and determine, and all the moneys theretofore paid by it shall be forfeited to said Railway Company as liquidated damages for and because of any such breach thereof; and the Railway Company may re-enter said described lands or any part thereof, in the name of the whole, and may have, repossess and enjoy the same as of its former estate."

This contract is properly acknowledged, but was not placed of record. Shortly before action was commenced by the Bank of California to foreclose its trust

mortgage, the Great Northern Railway Company gave notice of forfeiture, and having been made a party to the mortgage foreclosure, by answer and cross-complaint sought to establish its title to, and the right to, possession of all the lands described in the contract, and also the saw logs and timber cut and uncut at the time of the notice of forfeiture.  The trial court entered a decree quieting the railway company's title to the lands and declaring it to be the owner of, and entitled to the possession of, the saw logs and timber, both cut and uncut, and the receivers have appealed from that part of the decree.

[1]   The essential parts of the contract which are quoted clearly show that it is but an executory contract to convey lands.  It also contains a conditional license to cut and remove timber.  That such a contract conveys no title to the land is well established in this state.  *Ashford v. Reese,* 132 Wash. 649, 233 Pac. 29.

[2]   We think it was also the clear intention expressed in this contract to fix a time within which timber might be cut and removed, and the contract having been terminated on account of default of the vendee, all rights to enter and remove timber, either that which is standing or that which is cut, is terminated.  *Allen & Nelson Mill Co. v. Vaughn,* 57 Wash. 163, 106 Pac. 622.   See, also, the observations in *Hendrickson v. Lyons,* 121 Wash. 632, 209 Pac. 1095; *France v. Deep River Logging Co.,* 79 Wash. 336, 140 Pac. 361, Ann. Cas. 1916A 238; *Owens v. Lewis,* 46 Ind. 488, 15 Am. Rep. 295; *Hodsdon v. Kennett,* 73 N. H. 225, 60 Atl. 686.   The above cited cases are but a few of the many which have been examined, and we think clearly sustain the decision of the trial court on this phase of the case.

There is also involved in the Great Northern Railway Company case the question of certain rails, bolts, spikes and angle bars which were furnished to the lumber company by the Great Northern Railway Company under and by virtue of a contract dated July 24, 1925, the material parts of which are as follows:

"WITNESSETH: That in consideration of the payments hereinafter stipulated to be made by the Lumber Company to the Railway Company and the full performance by the Lumber Company of all the terms and conditions of this agreement at the time and in the manner herein set forth, it is hereby mutually agreed as follows:

"(1)　The Railway Company agrees to and does hereby lease to the Lumber Company, for the term hereinafter stated, used rails, bolts, spikes and angle bars, in quantities as follows:

| Material | Estimated Weight |
| --- | --- |
| Rail—63,360 lineal ft. 60 lb | 1,235,520 lbs. |
| Track Bolts—¾x3¾"—7 kegs per mile, 42 kegs | 8,400 lbs. |
| Track Spikes—9/16x5½"—32 kegs per mile, 192 kegs | 38,400 lbs. |
| Angle Bars 6 track miles, or 4,224 pcs. @ 17½ lbs. each | 73,920 lbs. |
|  | 1,356,240 lbs. |

or 605 gross tons, 1,040 lbs.

"Delivery shall be made by the Railway Company f. o. b. cars at Mount Vernon, Washington, at the rate of three cars per week; the actual weight of track and fastenings to be determined at time of delivery.

"(2)　The value of said material at the time and place of delivery by the Railway Company to the Lumber Company, and upon which the rental hereinafter mentioned shall be computed, is hereby mutually agreed to be forty dollars ($40.00) per gross ton for both rails and fastenings.

"(3)　The annual rental for said material shall be a sum equal to twelve per cent (12%) on the total value

of the same, established on the basis of the above unit price, and the Lumber Company covenants and agrees to pay said rental to the Railway Company annually in advance for each year this lease remains in effect.

"(4)   This lease shall terminate in five (5) years from the date hereof, but the Lumber Company shall have the right at any time prior to said termination, by giving the Railway Company thirty (30) days notice in writing of its desire so to do, to purchase the whole of the said rails and fastenings at the unit prices herein agreed to, less a deduction of six per cent (6%) for depreciation, and upon the completion of such purchase, this lease shall immediately cease and determine.

"(5)   The Lumber Company will pay to the Railway Company the rental herein specified, and in addition thereto, will pay and discharge before the same become delinquent any and all taxes, governmental charges and assessments made, assessed or levied against said leased property, or any part thereof, during the term of this lease.

"(6)   Upon the termination of this lease, other than by purchase, of the material as provided in paragraph 4 hereof, the Lumber Company agrees to redeliver said material to the Railway Company loaded on cars on the tracks of the Railway Company at Mount Vernon, Washington in as good condition as when received, ordinary wear and tear thereof excepted.   For any of said rails and fastenings not so redelivered at the termination of this agreement, the Lumber Company agrees to pay the Railway Company at the unit prices named herein.

"(7)   If the Lumber Company shall fail to pay the rental, or any part thereof, hereinbefore provided for, as and when due, the Railway Company may, at its option, terminate this lease and enter upon the Lumber Company's premises and remove said rails and fastenings; and the Lumber Company grants to the Railway Company the irrevocable right and license to enter upon the Lumber Company's premises for that purpose.   In the event of the removal of said rails and

fastenings by the Railway Company, the Lumber Company shall and will pay to the Railway Company the cost of removing said rails and fastenings and placing the material along side the tracks of the Railway Company at Mount Vernon, Washington.''

Some time in April, 1926, the railway company filed a petition in the case of *Mill & Mine Supply Co. v. Clear Lake Lumber Co., post* p. 697, 264 Pac. 714, (that being the receivership action), for the return of that portion of the track material covered by this contract, which was piled up at the plant of the Clear Lake Lumber Company; and on July 1, 1926, after a hearing on notice given to the interested parties, an order was made granting the relief asked for by the railway company. Thereafter, the receivers asked for the vacation of the order upon the ground that it was entered through inadvertence and mistake. An order was entered denying the same.

Without setting forth in detail the various phases of this portion of the controversy, we deem it sufficient to say that a careful examination of the record convinces us that the holding of the trial court was correct.

[3] The lower court denied to the Great Northern Railway Company, however, the right to recover any of the other material furnished by virtue of the last above quoted contract, evidently on the theory, as indicated by the briefs, that it was a conditional sales contract, and not having been properly filed within the time limit, or at all, no recovery could be had thereon. So that, the principal question to be determined is, whether or not the last quoted document is a conditional sales contract or a lease containing a conditional right to purchase, which it is necessary to file under our statute. Where the legal title to personal property constituting the subject of sale remains in the

vendor, but is to pass to the vendee for an agreed consideration upon his performing certain conditions named in the contract, it constitutes a conditional sale. This court has so held in *Lundberg v. Kitsap County Bank,* 79 Wash. 75, 139 Pac. 769. The only language in the above quoted contract which would indicate that this is a conditional sale of personal property, or a lease thereof containing a conditional right to purchase, is contained in paragraph 4, which reads:

"(4) This lease shall terminate in five (5) years from the date hereof, but the Lumber Company shall have the right at any time prior to said termination, by giving the Railway Company thirty (30) days' notice in writing of its desire so to do, to purchase the whole of said rails and fastenings at the unit prices herein agreed to, less a deduction of six per cent (6%) for depreciation, and upon the completion of such purchase, this lease shall immediately cease and determine."

But this, it appears to us, is nothing but an option granted to the lessee, which he may or may not exercise as he sees fit. Certainly it cannot be claimed that, under this agreement, the lessor could have waived his right to retake the property and sued for the purchase price. A vendor in a conditional sales contract has a choice of remedies. He may disaffirm the sale by retaking the property, or he may affirm it by suing to recover the balance of the purchase price. *Jones v. Reynolds,* 45 Wash. 371, 88 Pac. 577. See, also: *Kimble Motor Car Co. v. Androw,* 125 Wash. 225, 215 Pac. 340. We conclude, therefore, that this is but a lease with an option to purchase, and that the Great Northern Railway Company is entitled to recover from the receivers all of the rails which have been properly identified, and to a judgment for the unpaid balance due under the lease, together with a judgment for the value of such rails as cannot be returned.

[4] The Northern Pacific Railway Company, one of the parties to this action, had furnished certain materials consisting of steel rails and angle bars to the Puget Sound & Cascade Railroad Company. There were three contracts between these companies for the delivery of the material, dated respectively, April 24, 1923, February 23, 1924, and July 22, 1924. The two last-named contracts are identical in terms, while the first contract varies in some particulars. Without setting these contracts forth in detail, it may be said that each of them comes within the terms of our conditional sales statute. The controversy arose by reason of the provision in each of the contracts providing for payment of "interest to the Northern Pacific Railway Company upon such purchase price at the rate of six (6) per cent per annum," in the two last-named contracts, and the provision to pay "rental for such rails and angle bars at the rate of six (6) per cent per annum," in the first mentioned contract.

The lower court permitted recovery of the material sold, but denied the railroad a money judgment thereon for interest or rent, whichever it may be called. All of these contracts provided that, in case of default or in case it was necessary to retake any of the material sold, such mill company was "to return such material to the railway company loaded on cars at the station Clear Lake." This material, having been identified, was found to be distributed along the various lines of operation, and the undisputed testimony is that it would require $13,805.13 to place the same on the cars at Clear Lake. The lower court by its judgment provided that, in case the Northern Pacific Railway Company should incur any expense in recovering and collecting such material, it should have judgment therefor. Whether the amounts sought to be recovered be called "interest," as they are denominated in two of the

contracts, or ''rental,'' as they are denominated in the third contract, they amount to nothing more than interest on the purchase price. If the principal cannot be recovered, certainly there can be no recovery of interest.

''We have also held that an election to reclaim the property is equally a waiver of the right to claim any unpaid balance on the purchase price. *Ramey v. Smith,* 56 Wash. 604, 106 Pac. 160; *Winton Motor Carriage Co. v. Broadway Automobile Co.,* 65 Wash. 650, 118 Pac. 817, 37 L. R. A. (N. S.) 71; *Stewart & Holmes Drug Co. v. Reed,* 74 Wash. 401, 133 Pac. 577; *Eilers Music House v. Douglas,* 90 Wash. 683, 156 Pac. 937, L. R. A. 1916E 613; *Norman v. Meeker,* 91 Wash. 534, 158 Pac. 78, Ann. Cas. 1917D 462; *Barbour v. Hodge,* 99 Wash. 578, 170 Pac. 115; *Jordan v. Peek,* 103 Wash. 94, 173 Pac. 726.'' *Kimble Motor Car Co. v. Androw,* 125 Wash. 225, 215 Pac. 340.

[5]   As to the item of $13,805.13 for and on account of the taking up of the rails and returning them to Clear Lake, the parties themselves have, by their contract, provided that, in case it became necessary to retake these rails, they would be delivered at Clear Lake. There is no uncertainty or ambiguity in this provision.

We think the law is so well settled as to require no citation of authority that, upon breach of such contracts, the rights of the parties become fixed, and the defaulting party, having failed to deliver this material at the place designated by the contracts, the injured party is entitled to recover the cost of such delivery. The amount not being in dispute, we hold that the Northern Pacific Railway Company is entitled to a judgment in the sum of $13,805.13, and the judgment of the lower court in its favor is modified so as to include that amount.

All other matters in this appeal seem to be involved in the controversy between the Bank of California, as

Trustee for the bondholders, and the receivers. It is claimed, generally, that the court erred, first in refusing to permit the receivers to recover from the railroad company something over $400,000 for the cost of construction of that portion of the railroad from Potts to Phinney creek; second, in holding certain after-acquired property subject to the lien of plaintiff's mortgage; third, in refusing to hold the receivers claims, approximating $46,000, as being prior to the mortgage, the court allowing only approximately $12,-000 of this amount as prior to the mortgage, this being the wages of watchmen; fourth, in permitting the mortgage to be reformed so as to include certain real property known as the "reservoir property;" and fifth, that the court erred in failing to adequately preserve the equity of redemption.

As stated generally in the first part of this opinion, the Clear Lake Lumber Company, for which the receivers were appointed, owned all of the capital stock of the railroad company, and under and by virtue of the terms of the mortgage given by the lumber company to the bank, pledged with the bank all of the capital stock of the railroad company, schedule "C," page 26 of the mortgage reading as follows:

"Also all of the capital stock of the Puget Sound & Cascade Railroad Company, both preferred and common, said corporation being a corporation organized under the laws of the State of Washington and having a total capital stock of five hundred thousand dollars ($500,000) consisting of three hundred thousand dollars ($300,000) of common and two hundred thousand dollars ($200,000) of preferred stock; Provided, however, that the mortgagor company may vote said stock until default is declared and possession demanded by the Trustee under the terms of this contract."

And in pursuance of the terms of this mortgage the stock was actually delivered. This railroad was a com-

mon carrier and the Interstate Commerce Commission had assumed jurisdiction over the road in 1916.

[6] The first question to be determined is whether or not the Interstate Commerce Act, Laws of 1920, U. S. Comp. Stat. (1923 Supp. § 8563) is applicable to a situation such as we here find. This act provides generally as to how, when and under what conditions railroads may build, or extensions thereto be constructed; how and under what conditions capital stock, bonds, or evidences of indebtedness may be issued, and how and under what conditions railroads may assume any obligations or liability. The act is long and involved, and no good purpose could be served by setting it out in full. A careful examination of the act and the cases construing the same convinces us that it has no application to a situation such as we here find. *Detroit & Michigan R. Co. v. Boyne City,* 286 Fed. 540; *Railroad Comm. v. Southern Pacific Co.,* 264 U. S. 331; *Detroit Terminal R. Co. v. Pennsylvania-Detroit R. Co.,* 15 Fed. (2d) 507.

[7] It is urged, however, that because of the representations made to the bond buyers before the mortgage was given, both the Clear Lake Lumber Company and its receivers are now precluded from maintaining any action upon that portion of the claim existing at the time of the giving of the mortgage. We think the general rule is that the receivers have no greater rights as representatives of the insolvent corporation, its creditors and stockholders than the lumber company had. The receivers take the property as they find it. They cannot maintain any claim (save in certain excepted cases, and this is not one of them) which the company could not assert. Neither is any defense available to the trustee under its mortgage abrogated. *Sumner Iron Works v. Wolton,* 61 Wash. 689, 112 Pac. 1109; *Thomson Estate v.*

*Washington Investment Co.,* 84 Wash. 326, 146 Pac. 617; *Moore v. American Savings Bank & Trust Co.,* 111 Wash. 148, 189 Pac. 1010; 23 R. C. L. 121.

Prior to the time of making the mortgage to the bank, the lumber company had prepared by certified accountants a financial statement. By this statement, all of the moneys advanced by the lumber company for the building of the extension in question were carried as a capital investment or asset of the lumber company. An examination of the statement and the testimony of the examiners shows that, in no way, was it indicated that this was to be a charge against the railroad company, and this method of doing business is readily understandable. The lumber company owned all of the capital stock of the railroad company. Investments made for and on behalf of the railroad company could inure to the benefit of no other person, firm or corporation than the lumber company. It could make no difference whether the improvements were made on property the title to which stood in the name of the lumber company or on property the title to which stood in the name of the railroad company. The ultimate benefits were all to go to the stockholders of the lumber company.

At the time this stock was pledged, the bank was justified in assuming that the physical assets of the railroad company were free from any claim of the lumber company, because the books of the lumber company did not reveal any such claim, nor can one now be created simply because a bookkeeper subsequently transposed these figures from one column to another. To permit this to be done would greatly depreciate the value of the security held by the bank; would make prior to the lien of the mortgage a very large and substantial sum. The most elementary doctrines of estoppel would forbid the lumber company this course

of action, and under the authority of the cases heretofore cited, we hold that the receivers are precluded from urging the claim.

[8]  In reference to those items comprising the expenditures after the date of the mortgage, a different situation exists.  The money and property going into the construction of the railroad was not subject to the mortgage, and it would be inequitable to allow money, which, had it not been expended by the lumber company, would have been available for the creditors, to be used in this way and permit no recovery to be had. The books of the company show that there was expended by the lumber company, on behalf of the railroad company after the date of the mortgage, $120,-587.90.  This amount is shown by the Clear Lake Lumber Company's analysis of the Skagit river extension account, being receiver's exhibit No. 41.  There is, however, nothing from which we are able to determine the various items which go to make up this charge.  From an examination of the contracts entered into between the lumber company and the Great Northern Railway Company, and between the lumber company and the Northern Pacific Railway Company, covering the furnishing of certain railroad materials and supplies, it has seemed to us probable that these items make up a part of this amount.  The dates of some of these contracts would seem to so indicate.  The Great Northern and Northern Pacific having now been permitted to recover the material furnished, if these are included items, the amount thereof should be deducted from the amount of the lumber company's claim, and the receivers should be permitted to recover only those amounts for which the railroad company had no defense.

[9]  Coming now to the second point, namely, whether or not the lien of the mortgage covered certain

after-acquired property, we think we may safely say that the legal effect of an after-acquired property clause in a mortgage is, in so far as we have been able to determine, largely a new question in this state. Schedule ''D'' of the mortgage in question provides as follows:

''Also all mill and other buildings, structures and improvements and machinery therein; . . . also all rails, steel rails, whether laid or not; all tramways, boom grounds, logging roads, skid roads, all rolling stock, cars, engines, machinery, mills apparatus and equipment of every kind and character now being or that may hereafter be built or placed on or connected with the real property hereinabove described or upon any portion thereof or now or hereafter used in connection with the logging, lumber or shingle or manufacturing business of the company, or in the marketing of the timber or products therefrom, with all the appurtenances thereunto belonging or in any wise appertaining, and all rights of way or easements through, upon or over adjoining lands or properties appurtenant to or useful for the lands described herein or any part thereof, or in the mill or logging business of the company. All franchises, liens, licenses, easements, rights, privileges or immunities appertaining to the property or properties of the company or connected with the business of the company above mentioned and any and all extensions thereof and additions thereto and all replacements or removals of said machinery, equipment and personal property or any part thereof, it being intended to cover hereby generally all the property of the company, real personal and mixed, save and except the following: raw materials, manufactured products or products in process of manufacture, camp supplies, stocks of merchandise, accounts and bills receivable, money and cash on hand; also all logs or lumber after cut and/or milling charges have been paid into the sinking fund as herein elsewhere referred to.''

It should be remembered that this mortgage covered a vast industrial plant, a going concern, engaged in

large operations. The property which the receivers seek to free from the lien of the mortgage is, as compared with the entire plant, very meager in quantity. It is claimed on behalf of the receivers that the company was insolvent at the time this property was acquired. An examination of the record on this point indicates to us that, while possibly the company was showing some evidence of insolvency, yet it was still a going concern; and it was hoped and believed, not only by the management, but by all of the creditors, that the business conditions would improve and that the company would again be on a solid and substantial basis. We think this company was not insolvent at the time of the acquisition of this property, as that term is ordinarily and generally used, or within the decisions of this court. The class and character of the property mortgaged were such that it was constantly undergoing replacements, repairs, improvements, additions and extensions. This mortgage covered generally a vast mechanical establishment. The after-acquired property did not, in any sense, either become or remain new, different or additional property, but rather became an integral part of the original plant. Establishments such as this are continually requiring repairs and replacements, and to hold that the materials used in maintaining the plant as a going, efficient concern are free from the mortgage would soon cause the loss of the security of the mortgage.

Among other cases which we have examined, the following may be cited: *Harris v. Youngstown Bridge Co.*, 90 Fed. 322; *Wade v. Chicago, etc. R. Co.*, 149 U. S. 327; *Brady v. Johnson*, 75 Md. 445; *Minnesota Loan & Trust Co. v. Peteler Car Co.*, 132 Minn. 277, 156 N. W. 255; *Central Trust Co. v. Kneeland*, 138 U. S. 414; 34 L. Ed. 1014; Fletcher on Corporations, Vol.

3, § 1279; *Hickson Lumber Co. v. Gay Lumber Co.,* 150 N. C. 282, 63 S. E. 1045, 21 L. R. A. (N. S.) 843.

We hold, therefore, that this after-acquired property, being in the nature of repairs and replacements for an industrial plant, is covered by the lien of the mortgage.

[10]   The third question on this appeal presents the question of whether or not any portion of the receivers' expenses should be held to be prior to the mortgage. The bank was in no way a party to the securing of the appointment of a receiver. We have heretofore held that where a receiver is appointed for mortgaged personal property at the instigation of some person other than the mortgagee, no part of the expenses of the receivership can be made a charge against the property or superior to the rights of the mortgagee. *Lammon v. Giles,* 3 Wash. Terr. 117, 13 Pac. 417.

As near as we are able to gather the situation from the record presented in this case, there was a considerable amount of property owned by the lumber company not covered by the mortgage, and it was entirely right and proper, under the circumstances disclosed by this record, that a receiver should have been appointed. As we understand the situation, the property owned by the lumber company, both that covered and that not covered by the mortgage, was so commingled that it became necessary to conserve and care for all of the property rather than that alone which was free from the lien of the mortgage. Only to a limited extent have courts of equity made the expenses of a receiver a lien prior to mortgage liens, and that under the theory that, while carrying out his duties and doing the work for which a receiver is appointed, it necessarily inures to the benefit of the mortgage claimant. So in this case, while the expenses allowed to the receiver aggregated the sum of $46,000, the

court allowed as a prior claim the total of $11,794.59, for watchmen's wages. It seems to us that this allowance was right, and proper, and that this service inures directly to the benefit of the mortgagee, and that this claim was rightfully held to be a prior lien to that of the mortgage.

A very complete discussion of this point and review of the authorities is contained in the case of *Central Trust & Savings Co. v. Chester County Electric Co.,* 9 Del. 247, 80 Atl. 801. The judgment of the lower court on this matter will be affirmed.

[11] The court permitted the mortgage to be reformed so as to include certain real property known as the "Reservoir property." Subsequent to the execution of the mortgage, and prior to the commencement of this action, the lumber company instituted an action in the superior court for Skagit county, to which action the bank was made a party defendant, alleging generally that there had been a mistake in the preparation of the mortgage, and that, by reason of this mistake, the mortgage or deed of trust

". . . is a lien upon a large amount of real property belonging to the plaintiff not intended to be covered thereby . . . and that the mortgage or deed of trust should be reformed so as to speak the real truth or intention of the parties."

The bank appeared in such action and filed its answer. A decree of reformation was entered reforming such mortgage, holding certain property subject thereto and excepting "the real estate of the Clear Lake Lumber Company owned by the company at the time of the excution of this mortgage not specifically described hereinbefore." No appeal was ever taken from that decree. It is the contention of the receivers that this decree of reformation is *res judicata,* and this contention must be upheld. A judgment or decree is

binding and conclusive upon all the parties as to all the matters litigated, and a decree of reformation by its terms exempting all real estate not specifically described in the mortgage, and the record showing clearly that this property is not described in the mortgage, it is therefore free from the mortgage lien, and no reformation can be had in the subsequent action. The rule is well settled in this state. *Bruce v. Foley,* 18 Wash. 96, 50 Pac. 935; *Stay v. Stay,* 53 Wash. 534, 102 Pac. 420; *Munson v. Baldwin,* 93 Wash. 36, 159 Pac. 1070; *Rader v. Sander,* 100 Wash. 403, 171 Pac. 257.

[12]    Complaint is made that the equity of redemption is not properly preserved in this case. The decree provides that the property may be sold either by separate parcels or in bulk. There seems to be no provision in our statute authorizing the sale of combined real and personal property in bulk. It is true that an industrial plant such as this might be more advantageously sold as a whole, combining both the real and personal property, but this is a question for the legislature and not for the courts. Rem. Comp. Stat., §§ 583 to 587 [P. C. §§ 7906, 7897], provides how a sale of real estate shall be conducted. Other sections of the statute cover the sale of personalty. The method of conducting sales under mortgage foreclosure being prescribed by statute, the decree should follow such provisions.

The judgment is reversed, with instructions to the lower court to proceed in accordance with this opinion.

MACKINTOSH, C. J., MITCHELL, ASKREN, MAIN, HOLCOMB, PARKER, and FULLERTON, JJ., concur.

TOLMAN, J. (dissenting)—I concur, except as to that part which directs a judgment in favor of the Northern Pacific R. Co. The judgment of the trial court fully

protected the Northern Pacific R. Co., in case it incurred expense in the retaking of the property, and in my opinion it is entitled to nothing more.